JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DANNY SABANA,

          Plaintiff,

v.

CORELOGIC, INC., et al,

          Defendants.

Case No. 8:23-cv-00965-HDV-JDE

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [DKT. NO. 31]**

## I. INTRODUCTION

The Employee Retirement Income Security Act of 1974 ("ERISA") obligates retirement plan fiduciaries to act with prudence, loyalty, and diligence, solely in the interest of participants and beneficiaries. This putative class action alleges that Defendant CoreLogic, Inc. ("CoreLogic"), together with its plan administrator, breached its duties under ERISA to employees invested in its 401(k) retirement plan. In broad strokes, Plaintiff Sabana—a former employee and 401(k) plan participant—alleges that CoreLogic fell short of these standards because it (1) overpaid for recordkeeping services by offering costly investment options that used revenue sharing to pay high fees to the plan's recordkeeper, and (2) offered and retained several funds that performed worse than industry standard benchmarks. In support of his first theory, Plaintiff claims that a *reasonable* annual recordkeeping fee is just $40 per participant, but that participants in CoreLogic's 401(k) plan paid, on average, substantially more than $40 in recordkeeping costs per year.

Before the Court is Defendants' Motion to Dismiss ("Motion"). The Motion disputes Plaintiffs' theory of breach and argues that Plaintiff lacks standing to assert these claims on behalf of the putative class. Specifically, Defendants contend that—accepting as true Plaintiff's own allegations vis-à-vis reasonable recordkeeping fees—Plaintiff cannot allege any financial injury.

The Court agrees. The doctrine of standing, grounded in Article III of the Constitution, limits the category of litigants who can sue in federal court to those who can demonstrate, among other things, an actual and redressable injury. Here, as Defendants have shown, Plaintiff paid *less* in annual recordkeeping fees than the $40 he considers reasonable. The fact that other plan participants—perhaps even most—may have paid more than this amount has no bearing on Plaintiff's individual standing. Plaintiff, moreover, was not invested in any of the underperforming funds he specifically challenges, and so cannot allege that he was injured by their lackluster returns. Based on his own theory of liability, and holding Plaintiff to the allegations in his Complaint (as the Court must), Plaintiff was not injured by the misconduct he alleges. He therefore lacks standing, and for that reason this Court lacks jurisdiction over the action.

Defendants' 12(b)(1) Motion is **granted**.

## II. BACKGROUND

CoreLogic offers the CoreLogic 401(k) Savings Plan (the "Plan") to eligible employees. Complaint [Dkt. No. 1] ¶¶ 1–4. Employees' Plan accounts are funded through a combination of deferred compensation and matching contributions by CoreLogic. *Id.*; *see* Declaration of Catalina Vergara ("Vergara Decl.") [Dkt. No. 31-1] Ex. J at 36. The Plan is a defined-contribution plan, *see* Complaint ¶ 4, which "provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses," *see* 29 U.S.C. § 1002(34).

The Retirement Committee of CoreLogic, Inc. 401(k) Savings Plan (the "Committee") acts as the Plan administrator and oversees the Plan's operations. During the relevant period, Fidelity Investments Institutional Operations Company ("Fidelity") was engaged as the Plan recordkeeper. Complaint ¶¶ 19–22; Vergara Decl. Ex. D at 5, 7. The Plan made indirect payments to Fidelity through a process known as "revenue sharing," where payments are proportional to Plan assets. Complaint ¶¶ 45, 68–69, 98. The Plan's investment lineup, over the relevant period, included dozens of different funds. Vergara Decl. Ex. A at 3–4.

Plaintiff, a former CoreLogic employee and Plan participant since Q2 2019, filed this class action on June 2, 2023, on behalf of all Plan participants since June 2, 2017. Complaint ¶ 185. He asserts two causes of action against CoreLogic and the Committee (together, "Defendants"): breach of fiduciary duty of prudence under ERISA, and a related claim for failure to monitor fiduciaries involved in those underlying breaches. Complaint ¶¶ 39–117, 118–83, 201–07. Plaintiff claims these actions caused Plan participants significant financial losses, and he seeks various forms of relief, including monetary compensation. Complaint at pp. 46–47 ("Prayer for Relief").

Defendant filed the instant Motion to Dismiss ("Motion") on August 16, 2023. [Dkt. Nos. 31, 43, 46]. The Motion seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(1) on the issue of standing, and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *See generally* Motion. The Court heard oral argument on November 16, 2023. [Dkt. No. 57].

## III. LEGAL STANDARD

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must

dismiss the action." Fed. R. Civ. P. 12(h)(3).  A defendant may raise the defense of lack of subject-matter jurisdiction by motion pursuant to Federal Rule of Civil Procedure 12(b)(1).  The party asserting jurisdiction bears the burden of establishing subject-matter jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

Article III standing is "a jurisdictional prerequisite to a federal court's consideration of any claim." *DaVita, Inc. v. Amy's Kitchen, Inc.*, 379 F. Supp. 3d 960, 967 (N.D. Cal. 2019), *aff'd*, 981 F.3d 664 (9th Cir. 2020).  To demonstrate standing, a plaintiff must have suffered an injury in fact that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  Injury in fact is the foremost element of standing. *Matter of E. Coast Foods, Inc.*, 80 F.4th 901, 907 (9th Cir. 2023).  A plaintiff establishes injury in fact when he has suffered an invasion of a legally protected interest that is "concrete and particularized," meaning the injury must "actually exist" and "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40 (2016).

## IV.   DISCUSSION

### A.  Article III Standing

A challenge to a plaintiff's standing "can be either facial, confining the inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint." *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).  "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Id.*

Defendants' Motion makes a factual challenge to Plaintiff's standing.  Defendants attach Plaintiff's account statements, *see* Vergara Decl. Ex. A [Dkt. No. 31-2], and the Plan's Forms 5500, *see* Vergara Decl., Exs. E–J [Dkt. Nos. 31-6–11], to support their contention that Plaintiff did not suffer any injury due to the conduct he alleges.  Those documents are properly before this Court on Defendants' 12(b)(1) motion.  *See Savage*, 343 F.3d at 1040 n.2.[1]

---

[1] The Court need not reach Defendants' Request for Judicial Notice [Dkt. No. 31-13] because it does not reach Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6).  The Court considers these

Plaintiff's theory of the case frames the standing analysis. Plaintiff alleges that Defendants breached their fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1).[2] As Plaintiff explains, the Complaint challenges both (1) Defendant's imprudent selection and retention of funds, based on "several funds that fell below established benchmarks," and (2) "Defendants' failure to monitor fees," based on "various funds where Defendants offered higher cost share classes instead of the lower cost share classes that were available" and "the overall unreasonable recordkeeping fees Defendants' [sic] paid Fidelity." Opposition to Defendants' Motion to Dismiss ("Opp.") [Dkt. No 43] at 5; *see* Complaint ¶¶ 118–83 (underperforming funds); *id* ¶¶ 39–117 (fees). The Court addresses Plaintiff's standing under each theory in turn.

### 1. Underperforming Funds

Plaintiff identifies five funds he argues should have been replaced due to their underperformance compared with recognized benchmarks, including the Morningstar Category Index, the Primary Prospectus Benchmark, and the Morningstar-selected Best-Fit Index. Complaint ¶¶ 118–83. Defendants' evidence demonstrates, however, that Plaintiff was not invested in any of these five funds. Vergara Decl. ¶ 3 & Ex. A.

Under the Ninth Circuit's class action approach to ERISA standing, this observation alone is not necessarily fatal. "[O]nce the named plaintiff demonstrates her individual [Article III] standing to bring a claim, the standing inquiry is concluded," *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015), and the plaintiff may seek relief that "sweep[s] beyond their own injuries on behalf of the Plan and other plan participants," *In re Sutter Health ERISA Litig.*, No. 1:20-CV-01007-JLT, 2023 WL 1868865, at *5 (E.D. Cal. Feb. 9, 2023). Courts have held that plaintiffs challenging underperforming funds can demonstrate the requisite individual injury where they either (i) invested

---

documents in ruling on Defendants' 12(b)(1) motion.

[2] Of Plaintiff's two causes of action, the second—breach of duty to monitor—is irrelevant for standing purposes because it depends on the underlying injuries Plaintiff seeks to remedy through his first cause of action. *See Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *8 (C.D. Cal. Apr. 24, 2020). Plaintiff does not argue that his monitoring claims can proceed absent *standing* to assert his direct fiduciary-duty claims. *See* Opp. at 24–25 (addressing monitoring claims on a 12(b)(6) standard).

5

in at least one of the challenged funds or (ii) challenge a "plan-wide" decision-making process that injures all plan participants. *Id.* But in no event may a plaintiff bring an ERISA claim without demonstrating, through some theory, concrete and individual harm. "ERISA's grant of statutory standing only applies once plaintiffs first demonstrate Article III standing." *Id.*

Because Plaintiff was not invested in any of the funds challenged for benchmark-underperformance, he can maintain his claim only by alleging "plan-wide" misconduct that injured *all* plan participants. And Plaintiff does assert a theory of plan-wide misconduct—to wit, that Defendants paid excessive recordkeeping fees through revenue sharing. Complaint ¶¶ 39–117. Plaintiff's standing therefore rises or falls on whether he can show concrete and individual harm under an excessive-fees theory. *See* Opp. at 5.

**2. Excessive Fees**

"Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing." Complaint ¶ 44. Plaintiff challenges the second method as a general matter, because payments proportional to assets "bear no relation to the actual cost to provide services or the number of plan participants and can result in the payment of unreasonable recordkeeping fees." *Id.* ¶ 48. And that is exactly what Plaintiff says happened here. The Complaint grounds its theory of harm in the allegation Defendants improperly offered high-cost share classes that compensated Fidelity through revenue sharing. *See, e.g.*, Complaint ¶ 105 ("[B]y focusing on funds with expensive share classes that generated high funds for revenue sharing, the Plan limited the universe of funds available …. The erosive effect of excessive fees and the resulting lost returns compounds over time substantially lowering the corpus of participants' retirement investments."). Plaintiff uses the Plan's publicly available Forms 5500 to calculate "direct and indirect compensation levels" and asserts that the net recordkeeping fees Defendant paid to Fidelity were "excessive." Complaint ¶¶ 50–51.

Although the Complaint's section headings formally delineate between allegations that Defendants overpaid for recordkeeping services, Complaint ¶¶ 39–77, and allegations that Plan participants paid excessive fees and lost returns because CoreLogic offered high-cost share classes

6

(rather than cheaper classes of the same funds), Complaint ¶¶ 78–117, the Court agrees with Defendants that these are "different sides of the same coin," *see* Reply at 2. "In a revenue sharing agreement," "a portion of the expense ratio" is directed to "the 401(k) plan's recordkeeper." Complaint ¶ 45. And inflated expense ratios tied to revenue sharing is precisely what Plaintiff challenges about the high-cost share classes: "The use of expensive share classes was likely motivated by an improper desire to hide fees from Plan participants by using revenue sharing to pay fees instead of directly drawing them from the Plan or Defendants being billed directly for the fees." Complaint ¶ 91.[3] In effect, "Plaintiff[] allege[s] that a more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate and/or obtain reasonable direct compensation per participant recordkeeping/administration costs with no strings attached." *Cf. Tobias v. NVIDIA Corp.*, No. 20-CV-06081-LHK, 2021 WL 4148706, at *3 (N.D. Cal. Sept. 13, 2021) (citation omitted).[4]

This theory focuses the standing inquiry. Plaintiff has Article III standing if the Plan's allegedly excessive recordkeeping fees—which he claims resulted from the availability of high-cost share classes that used revenue sharing, rather than cheaper, otherwise identical share classes— injured ***him***. The Court concludes that Plaintiff cannot make this showing.

The basic reason is easily grasped. A decision to pay fees proportional to assets differentially affects Plan participants. Investment accounts above a certain value will pay more than they would

---

[3] *See also* Complaint ¶ 68 ("The unreasonable fees paid to Fidelity through revenue sharing arrangements directly resulted from the Defendants' choice of improper mutual fund share classes and failing to monitor the fees paid to Fidelity."); *id.* ¶ 74 (arguing that Defendants should have chosen "mutual fund share classes with lower revenue sharing"); *id.* ¶ 105 (alleging that the plan "focus[ed] on funds with expensive share classes that generated high funds for revenue sharing"); Opp. at 6 ("Plaintiff has standing because he was harmed by a plan-wide failure to reign in fees and pay them appropriately instead of through investment in high-fee share classes and he was harmed by a failure to select appropriate investments instead of stocking the plan with high-fee investments which harmed Plaintiff and deprived him of an opportunity to invest in better choices.").

[4] At oral argument, the parties briefly disputed whether the share-class and excessive-fee theories were "analytically distinct." [Dkt. No. 57]. For the reasons discussed above, the Court cannot agree with Plaintiff that diminished returns due to investment in a share class that uses revenue sharing constitutes an injury distinct from excessive recordkeeping fees. The only allegations wholly separable from Plaintiff's excessive-fee theory are his claims about the five underperforming funds—claims that Plaintiff has no independent standing to pursue. *See* Section IV.A.2, *supra*.

under a flat-fee structure; those below, less. For the same reason, a speeding ticket in a jurisdiction that assesses fines proportional to income is more or less costly, depending on an individual's earnings, than a flat $250 fine. *See* Alec Schierenbeck, *The Constitutionality of Income-Based Fines*, 85 U. CHI. L. REV. 1869, 1870–71 (2018).

Here, Plaintiff asserts that a "reasonable recordkeeping fee" for Defendants' Plan is "approximately $40 per participant." Complaint ¶ 49. Using Defendants' Forms 5500, Plaintiff calculates that the average recordkeeping fee per participant—total direct and indirect fees, minus rebates, divided by the number of employees—was higher than $40 in five out of six relevant years. Complaint ¶¶ 50–57. This discrepancy is the basis for Plaintiff's core claim that Defendants paid excessive recordkeeping fees.

Plaintiff, however, paid far less than $40 per year during the relevant period. Plaintiff has invested in one fund at all relevant times: the T. Rowe Price 2050 Target Date Fund. Vergara Decl. Ex. A. Plaintiff's account statements show that he did not pay any direct recordkeeping fees to Fidelity; instead, any recordkeeping fees were paid through indirect revenue sharing. *See id*. Defendants' Forms 5500 from 2019 through 2022 show that the T. Rowe Price 2050 fund paid 0.15% annually in indirect compensation to Fidelity each year. *Id*. Exs. H–J.[5] Multiplying 0.15% by the year-end values of Plaintiff's account and subtracting rebates[6] indicates that he paid annual indirect compensation significantly below $40. *See* Vergara Decl. ¶ 14.[7] Put another way, Plaintiff would have been *worse off* had he invested in the cheaper share class without revenue sharing, and

---

[5] When Defendants moved to dismiss, the Plan's 2022 Form 5500 was not yet available. Vergara Decl. ¶ 14 n.1. It is now accessible on the Department of Labor's website. *See* Complaint ¶ 38 (explaining public access to Forms 5500). In 2022, the 0.15% indirect compensation rate for the T. Rowe Price 2050 fund remained unchanged.

[6] This arithmetic does not require the insights of "an ERISA expert," *contra* Opp. at 8, and in fact finds support in Plaintiff's own method of totaling recordkeeping costs based on direct and indirect fees, *see* Complaint ¶ 50.

[7] The Court notes that this discrepancy remains when one calculates indirect fees using the *maximum* quarterly account balance for each given year, rather than the year-end balance used in Defendants' calculations.

8

instead paid $40 per year in direct recordkeeping costs.[8] Although the Court can imagine many Plan participants who might have standing based on high recordkeeping fees, *this* plaintiff cannot demonstrate any injury traceable to Defendants' alleged plan-wide practice of overpayment. *See Huang v. TriNet HR III, Inc.*, No. 8:20-CV-2293-VMC-TGW, 2022 WL 13631836, at *4 (M.D. Fla. Oct. 21, 2022) (dismissing a plaintiff's claims where "the fees [plaintiff] actually paid are well below the amount their own expert deems reasonable").

Plaintiff's primary counterargument cannot be squared with his theory of the case. In his Opposition, Plaintiff claims that although he alleges that $40 in recordkeeping costs would have been a reasonable plan-wide *average*, this does not necessarily mean it would have been "an appropriate fee burden for *Plaintiff*." Opp. at 8 (emphasis added). This argument ignores that the Complaint repeatedly attacks variable recordkeeping fees in general. Plaintiff claims that recordkeeping services "are essentially fixed and largely automated," that their costs "depend on the number of participants, not the amount of assets in the participant's account" and that, therefore, "the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account." Complaint ¶¶ 41–43. He criticizes the practice of paying recordkeeping fees through revenue-sharing offered by higher-cost share classes because such payments "bear no relation to the actual cost to provide services or the number of plan participants." Complaint ¶ 48; *see id.* ¶ 64 ("The bulk of the fee paid for recordkeeping service pays for core recordkeeping services that do not vary from plan to plan."). At the very heart of Plaintiff's theory of breach is the allegation that Defendants "paid Fidelity excessive and variable recordkeeping fees *that were not tethered to the services provided*." Complaint ¶ 51 (emphasis added); *see id.* ¶ 76 ("In sum, the Plan unreasonably paid Fidelity fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but

---

[8] The disparity between what Plaintiff paid in net recordkeeping costs, and the $40 that he asserts would have been reasonable, is far too significant to overcome by generally invoking "return lag." *See* Opp. at 9; *see also* Complaint ¶ 101 (explaining that the timing of revenue-sharing rebates can impact accrued gains). Plaintiff's investment, over the past several years, doubtless would have lost more in compounding returns by paying a $40 annual fee than through the indirect recordkeeping costs Plaintiff paid, no matter the relative timing of either deduction from Plaintiff's account.

9

rather varied based on revenue sharing of a larger corpus of Plan funds over time."). The only fair reading of the Complaint implies that Plaintiff believes it would have been more prudent to pay recordkeeping fees directly and at rates proportional to the services provided, which do not vary from participant to participant. If $40 is a reasonable average fee—and Plaintiff asserts as much—it follows that $40 is a reasonable fee for each individual participant, including Plaintiff.

### 3. Nonmonetary Relief

Independent of his standing to remedy past investment performance, Plaintiff briefly argues that he has standing to seek "declaratory and injunctive relief" without establishing any existing loss or damages. Opp. at 7. Plaintiff relies on *Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003) and two district court cases that, in turn, cite *Shaver* for the proposition that pecuniary loss is not a necessary ingredient of an ERISA claim. Opp. at 7.[9] "But these cases predate the Supreme Court's decision in *Thole*. There, the Court dismissed the plan participant plaintiffs' claims for injunctive relief for lack of injury-in-fact, noting that '[t]here is no ERISA exception to Article III.'" *Gleason v. Orth*, No. 2:22-CV-00305-JHC, 2022 WL 4534405, at *4 (W.D. Wash. Sept. 28, 2022) (citing *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020)).

*Shaver* is distinguishable in any event. Importantly, *Shaver*—which concerned a failure to keep accurate records—did *not* involve a standing challenge. *See Armijo v. ILWU-PMA Coastwise Indem. Plan*, No. CV151403MWFMRWX, 2018 WL 6265062, at *7 (C.D. Cal. Nov. 14, 2018) (pointing out that *Shaver* did not address standing). In *Shaver,* the Ninth Circuit explained that financial loss was not an element of the plaintiffs' claims seeking "purely equitable relief, either to enjoin future misconduct, or to have the trustees removed." *Shaver*, 332 F.3d at 1203. But determining whether a plaintiff has satisfied the "irreducible constitutional minimum" of standing is a distinct inquiry. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see Nw. Airlines, Inc. v. County of Kent*, 510 U.S. 355, 365 (1994) ("The question whether a federal statute creates a claim

---

[9] *See Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona Inc.*, No. CV-08-00457-PHX-ROS, 2017 WL 11630862, at *5 (D. Ariz. Dec. 15, 2017); *Del Castillo v. Cmty. Child Care Council of Santa Clara Cnty., Inc.*, No. 17-CV-07243-SVK, 2018 WL 11361335, at *21 (N.D. Cal. Nov. 19, 2018).

for relief is not jurisdictional."). A later Ninth Circuit opinion, *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123 (9th Cir. 2006), *did* squarely address Article III standing in the ERISA context. *Glanton* affirmed the necessity of an individual "concrete stake" and a redressable injury, *id.* at 1124, 1127, which Plaintiff here cannot demonstrate.

Even if *Shaver* is construed as bearing the issue of Article III standing—and some courts have read it that way[10]—its logic is consistent with *Glanton*. As one court has observed:

> [A]lthough *Glanton* did not distinguish between plaintiffs' claims for monetary and equitable relief, all of the plaintiffs' claims revolved around the alleged monetary loss to the plan. *Glanton* is therefore distinguishable from those cases [like *Shaver*] that address claims for injunctive relief that exist *wholly apart from claims for monetary relief* and find that no showing of redressable injury is required for the injunctive relief claims.

*Wells v. California Physicians' Serv.*, No. C05-01229 CRB, 2007 WL 926490, at *5 (N.D. Cal. Mar. 26, 2007) (emphasis added). Here, as in *Glanton*, Plaintiff does not seek any relief that is wholly separate from his monetary claims. The Complaint does not focus on enjoining the breach of a "concrete right afforded by ERISA, such as the statutory disclosure or record-keeping requirements," *see Palmason v. Weyerhaeuser Co.*, No. C11-0695RSL, 2013 WL 4511361, at *6 (W.D. Wash. Aug. 23, 2013),[11] and a review of Plaintiff's Prayer for Relief confirms his basic theory of liability: Defendants' imprudent actions have cost the plan money, and they should pay for the damage. *See* Prayer for Relief. *Shaver* does not excuse individual standing in that circumstance.

Even assuming Plaintiff could identify a prospective remedy other than disgorgement or an accounting of money owed due to imprudence, *see id.*, plaintiffs seeking prospective injunctive or

---

[10] *See Palmason v. Weyerhaeuser Co.*, No. C11-0695RSL, 2013 WL 4511361, at *6 (W.D. Wash. Aug. 23, 2013) (noting that some courts "have cited *Shaver* for the rather broad proposition that as long as an ERISA plan participant is seeking only equitable relief compelling the trustee to perform its fiduciary duty and/or removing the trustee from its position, the participant has standing regardless of any loss").

[11] *Cf. Thole,* 140 S. Ct. at 1621 (clarifying that decision reaffirming the importance of injury and individual standing did not concern "suits to obtain plan information"); *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1148 (3d Cir. 1993) (concluding that "ERISA does not require that harm be shown before a plan participant is entitled to an injunction ordering the plan administrator to comply with ERISA's reporting and disclosure requirements"); *Spinedex*, 2017 WL 11630862, at *2 (claim for breach of fiduciary duty sought "equitable relief" such as "the removal of the fiduciary").

declaratory relief must "demonstrate a reasonable likelihood of future injury" to have standing. *Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003). The "threatened injury must be certainly impending to constitute injury in fact," and "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). This Court does not read *Shaver* to hold otherwise, and certainly not after *Thole*. Here, Plaintiff has not established that his share of recordkeeping costs—less than $40 in every year so far—will "certainly" exceed that threshold and create an unreasonable drag on his investment returns. Indeed, Plaintiff's net recordkeeping fees *sharply declined* between 2021 and 2022. Vergara Decl. ¶¶ 3, 14.

Accordingly, the Court finds that Plaintiff's ancillary prayers for declaratory and injunctive relief do not sanction an end-run around the injury-in-fact requirement. In so holding, this Court does not find that "the beneficiaries are powerless to rein in the fiduciaries' imprudent behavior until some actual damage has been done." *Cf. Shaver*, 332 F.3d at 1203. Indeed, the premise of the Complaint is that a pecuniary injury has already occurred. The problem is simply that *this* plaintiff, through his allegations and representations, has shown exactly the opposite.

### B. Leave to Amend

Plaintiff argues in the alternative that he should be granted leave to amend and to conduct jurisdictional discovery. Opp. at 9–10. Limited discovery, Plaintiff says, would "establish the full fee burden on Plaintiff and what a reasonable fee for Plaintiff would be, challenge the fee calculations put forth by Defendants' counsel, establish that Plaintiff was harmed by the use of high-fee share classes, and establish harm based on the unavailability of low-fee, high performing funds." Opp. at 10. In particular, Plaintiff argues that he should be provided with "the 408(b)(2) fee disclosure that would show what [Defendants'] actual fees paid for recordkeeping were." *Id.* But Plaintiff's *own* calculation of these recordkeeping fees simply adds indirect and direct fees, sourced from Defendants' Forms 5500, to arrive at a total: the same basic method Defendants use. *See* Complaint ¶ 50. In his Opposition, Plaintiff does not explain (1) how his indirect recordkeeping fee could be higher than the 0.15% his fund allocates via revenue sharing; (2) how his direct recordkeeping fee could be greater than zero, when his statements show only a revenue *credit*; or (3) how his total recordkeeping fee burden could be higher than the sum of these two figures. As for

establishing "a reasonable fee for Plaintiff," for the reasons explained in Section IV.A.2, *supra*, Plaintiff's theory of the case forecloses any distinction between such a figure and a reasonable *average* fee, which Plaintiff directly alleges. The Court therefore finds that amendment to cure Plaintiff's lack of standing would be futile.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of subject-matter jurisdiction is ***granted***.[12] The Complaint is accordingly ***dismissed*** with prejudice.

Dated: January 26, 2024

_____
Hernán D. Vera
United States District Judge

---

[12] The Court does not reach the issues implicated by Defendants' 12(b)(6) motion.