**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
1117 State Street
Santa Barbara, CA 93101
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
christina@chumphreylaw.com

**BRADLEY/GROMBACHER, LLP**
Marcus J. Bradley (SBN 174156)
Kiley L. Grombacher (SBN 245960)
31365 Oak Crest Dr., Suite 240
Westlake Village, CA 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
mbradley@bradleygrombacher.com
kgrombacher@bradleygrombacher.com

Attorneys for Plaintiffs and the Putative Class

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINIDAD BIERA, ELIZABETH FIKSE, and DANNY SABANA, individually and as representatives of a Putative Class of Participants and Beneficiaries, on behalf of all similarly situated participants and beneficiaries on behalf of the CORELOGIC, INC. 401(K) SAVINGS PLAN,<br><br>      Plaintiffs,<br><br>      v.<br><br>CORELOGIC, INC., THE RETIREMENT PLAN COMMITTEE OF CORELOGIC, INC. 401(K) SAVINGS PLAN, and DOES 1 through 10,<br><br>      Defendants. | Case No.8:23-cv-00965-HDV-JDE<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**Judge:** Hon. Hernán D. Vera<br>**Place:** Courtroom 5B<br><br>**Complaint Filed:** June 2, 2023<br>**Trial Date:** TBD |

# TABLE OF CONTENTS

INTRODUCTION …………………………………………..……...…………..1

JURISDICTION AND VENUE…………………………..………..……….….……3

THE PARTIES…………………………………………………..……….......4

Plaintiffs…………………………………………………..…………..4

Defendants……………….......…………………………..……………. 6

DEFENDANTS' FIDUCIARY OBLIGATIONS….…………….……..…………… 7

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE FEES…………………………………………………………...........8

THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS……...…………..…..............10

FACTUAL ALLEGATIONS…………………………..……………...............11

A.   Defendants Paid Fidelity Unreasonable Fees, Failed to Monitor Fidelity, and make Requests for Proposals from Other Recordkeepers………..…....................................................11

B.   Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options.…..... 18

C.   Each Plaintiff Incurred Excessive Recordkeeping Fees and Experienced Diminished Returns Due to Investment in a Higher-Cost Share Class ……………………………………………….… 29

I.   Plaintiff Sabana Incurred Excessive Recordkeeping Fees…….... 29

II.   Plaintiff Sabana Lost Compounded Returns Due to Defendants' Imprudent Selection of Higher-Cost Share Classes..………...... 32

III.   Plaintiff Fikse Incurred Excessive Recordkeeping Fees.……... 33

IV.   Plaintiff Fikse Lost Compounded Returns Due to Defendants' Imprudent Selection of Higher-Cost Share Classes..………..... 36

V.    Plaintiff Biera Incurred Excessive Recordkeeping Fees. ...………………………………………….…......37

VI.   Plaintiff Biera Lost Compounded Returns Due to Defendants' Imprudent Selection of Higher-Cost Share Classes. ..……...... 39

D.    Defendants Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care, Which Lagged in Benchmark Comparisons, and for which they Selected Expensive Share Classes When Cheaper and Better Performing Funds Were Available ………………………………………………………… 41

CLASS ACTION ALLEGATIONS……………...........…….…………………..... 40

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence (Against All Defendants)……………………………………………………….…....... 58

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants)……...…………………….……………………………....... 60

THIRD CAUSE OF ACTION Prohibited Transactions (Against All Defendants)……...…………………….……………………………....... 62

PRAYER FOR RELIEF…………………………………………....…..….. 62

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Trinidad Biera, Elizabeth Fikse, and Danny Sabana ("Plaintiffs"), individually and as representatives of participants and beneficiaries of the CORELOGIC, INC. 401(K) SAVINGS PLAN, (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA", 29 U.S.C. §§ 1001 *et seq.*, on behalf of the Plan and seeking Plan-wide relief pursuant to ERISA §§ 502(a)(2),(3), 409(a), 1109, and/or as otherwise authorized by law, against current Plan sponsor, CoreLogic, Inc. ("CoreLogic"), The Retirement Plan Committee of CoreLogic, Inc. 401(k) Savings Plan, and John Does 1-10 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

**INTRODUCTION**

1.      This action is brought by current and former employees / participants / beneficiaries of Defendants' Plan to recover losses due to mismanagement of the 401k retirement plan and certain selected funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover funds owed back to the plan on behalf of employees / participants / beneficiaries. These retirement funds are significant to the welfare of the class.

2.      Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. § 401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards

-1-
FIRST AMENDED CLASS ACTION COMPLAINT

proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").

3. The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits. However, Defendants have not followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and review of publicly available documents to return benefits taken from Plan participants by Defendants.

4. The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2021, the Plan had 7,161 participants or beneficiaries and $741,898,999 in assets.

5. ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

6. Specifically, Defendants breached their fiduciary duties of prudence and loyalty to the Plan by:

   a. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan, which were in excess of reasonable fees and not tethered to the services provided;

b. Offering and maintaining funds with higher-cost share classes when identical lower cost class shares were available and could have been offered to participants resulting in participants/beneficiaries paying unnecessary costs for services that provided no value to them and resulted in a reduction of compounded return gains;

c. Retaining and offering poorly performing funds within the Plan which failed to meet or exceed industry standard benchmarks including Morningstar category indices and best fit indices as determined by Morningstar and even their own prospectus benchmarks when better performing and lower fee funds were available.

d. Depriving participants of compounded returns through the excessive costs and investment in expensive underperforming funds; and

e. Failing to maintain and restore trust assets.

7. As set forth in more detail below, Plaintiffs were injured during the Relevant Time Period by the Defendants' flawed processes in breach of their fiduciary duties. As a result of Defendant's actions, participants invested in subpar investment vehicles and paid additional unnecessary operating expenses and fees with no value to the participants and resulting in a loss of compounded returns.

8. Plaintiffs, individually and as representatives of a putative class consisting of the Plan's participants and beneficiaries, brings this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

9. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue

-3-

FIRST AMENDED CLASS ACTION COMPLAINT

a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

10.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and the Court has exclusive jurisdiction under ERISA § 502(e)(1), 29 U.S.C. §1132(e)(1).

11.   This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, Plaintiffs Biera, Fikse, and Sabana were employed in this District, and because ERISA provides for nationwide service of process.

12.   Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## THE PARTIES

### Plaintiffs

13.   Plaintiff Danny Sabana resides in Elk Grove, CA and was an employee of CoreLogic in Irvine, CA.  Sabana is a current participant in the Plan within the meaning of 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.  Mr. Sabana began investing in the T. Rowe Price Retirement 2050 Fund in the second quarter of 2019. In the second quarter of 2023, the Plan eliminated that fund and transferred his investment to the T. Rowe Price Retirement 2050 I CIT.  As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan

-4-
FIRST AMENDED CLASS ACTION COMPLAINT

wide-misconduct.  Sabana was damaged by the Defendants' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

14.     Plaintiff Trinidad Biera resides in Arlington, TX and was an employee of CoreLogic in Irvine, CA. Biera was a participant in the Plan from the first quarter of 2016 until the first quarter of 2020, within the meaning of 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.  Ms. Biera invested in the Fidelity Low Priced Stock, the Janus Henderson Triton I, the iShares MSCI EAFE International A, the MFS Growth R4, the T. Rowe Price Equity Index 500, the PGIM QS Small Cap Value Z, the  JPMorgan US Small Company L, the JPMorgan Research Enhanced Equity L, the Harbor International Opps Y, the Fidelity US Bond Index, the Baird Short Term Bond IS, the Allspring Core Bond Inst, the Fidelity Balanced, the T. Rowe Price Retirement 2025, the Vanguard Treasury Money Market, and thee Corelogic Common Stock. As a direct and proximate result of breaches of fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Biera was damaged by the Defendants' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

15.     Plaintiff Elizabeth Fikse resides in Colorado Springs, CO and was an employee of CoreLogic in Irvine, CA. Fikse was a participant in the Plan from the first quarter of 2016 until the first quarter of 2019, within the meaning of 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.  Ms. Fikse invested in the MFS Growth R4, the Fidelity US Bond Index, the T. Rowe Price Retirement 2020, and the Corelogic Common Stock. As a direct and proximate result of breaches of

FIRST AMENDED CLASS ACTION COMPLAINT

fiduciary duties described herein, the Plan, the Participants, and members of the putative class suffered substantial losses and legal damages in the form of higher fees and lower returns on their investments than they would have otherwise experienced due to investment in the Plan and Plan wide-misconduct. Fikse was damaged by the Defendants' breaches of their fiduciary duties which impacted the Plan as a whole and damaged all Plan participants.

16.    Plaintiffs Biera, Fikse, and Sabana have standing under 29 U.S.C. § 1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and insouciant actions caused actual harm to an ERISA plan in which the Plaintiff participates. Plaintiffs suffered an injury in fact by, *inter alia*, being forced to pay excessive fees to Fund service providers, investing in higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan, and being offered funds which failed to perform at or above their benchmarks. Defendants are liable to the Plan for the Plan's losses under 29 U.S.C. § 1109(a).

*Defendants*

17.    Defendant CoreLogic, Inc. is a Delaware Corporation and the current sponsor of the Plan.  It maintains its principal place of business at 40 Pacifica Avenue, Suite 900, Irvine, CA 92618. CoreLogic is registered to do business in the State of California, and upon information and belief, operates as a sponsor and administrator and/or fiduciary of the Plan.

18.    Defendant The Retirement Plan Committee of CoreLogic, Inc. 401(k) Savings Plan (the "Plan Investment Committee" or "Committee") is composed of a group of fiduciaries of the plan tasked with administering and overseeing the Plan including selecting, monitoring and maintaining the best interests of the plan participants and beneficiaries.

19.    Defendant "Does" or the names of the individuals on the Board of Directors and related Committee(s), as well as the Plan's manager, an CoreLogic's officers during the Relevant Time Period are unknown at this time and are named as

"John Does" until the "Does" are known and can be named through amendment to this Complaint.

20.    CoreLogic, the Board of Directors, the Plan Investment Committee, the Plan's manager, and the Directors and Officers are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

21.    Finally, although not named as a Defendants at this time, certain service providers are relevant non-parties to this Litigation.

22.    CoreLogic contracted with Fidelity Investments Institutional Operations Company ("Fidelity"), to serve as the Plan's recordkeeper. Fidelity served as the Plan's recordkeeper during the relevant time period based on Schedules C certified returns filed by CoreLogic.

23.    CoreLogic contracted with Fidelity Management Trust Company to serve as Trustee. In this capacity, Fidelity Management Trust Company received and held the assets of the Fund on behalf of the Participants and Beneficiaries.

24.    CoreLogic had a concomitant fiduciary duty to monitor and supervise those appointees and contracted parties.

### DEFENDANTS' FIDUCIARY OBLIGATIONS

25.    ERISA and common law trusts imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i)

-7-
FIRST AMENDED CLASS ACTION COMPLAINT

providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

26.     29 U.S.C. § 1104(a)(1)(B) and common law require a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

27.     A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. at 1829.

28.     29 U.S.C. § 1106(a)(1)(C) and § 1108(b)(2) and the common law allow a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." NFP and Fidelity are "parties in interest" under 29 U.S.C. § 1106(a)(1)(C).

29.     29 U.S.C. § 1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

30.     Section 1109(a) and common law provide "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959).

## DEFINED CONTRIBUTION 401(K) PLANS AND THE IMPACT OF EXCESSIVE FEES

31.     In a defined contribution plan, participants (and sometimes their employer) make contributions to plan participant's individual accounts. Participants'

retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus any investment gains less plan and investment expenses. *See* 29 U.S.C. § 1002(34). Plan Participants' investments are held in trust. Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

32. Because retirement savings in defined contribution plans are intended to grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound which can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. In short, the damages caused by breaches of fiduciary duties to the Plan cause damages that continue to accrue and compound over time.

33. In fact, the impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[1]

34. As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at

---

[1] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

FIRST AMENDED CLASS ACTION COMPLAINT

the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time.

35.    Accordingly, courts have recognized that plan fiduciaries "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International*, 843 F.3d 1187, 1198 (9th Cir. 2016).

36.    The marketplace for retirement plan services is established and competitive. Because of the Plan's large size and substantial assets, it has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

## THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

37.    Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and available for download from www.efast.dol.gov for forms filed in 2010 and onward).

38.    Plaintiff also requested Defendants Plan governing documents and this Complaint is based in part on the limited documents provided by Defendants, in addition to 408(b)(2) and 404(a)(5) statements, as well as the Fidelity administrative service agreement and amendments thereto.[2]

---

[2] Plaintiffs note that additional amendments may be appropriate following the Rule 16 conference and the commencement of discovery. In ERISA litigation, materials such as committee meeting minutes, investment advisor presentations, third-party service contracts, and internal communications between Plan fiduciaries and service providers often reveal facts that warrant refinement of existing allegations or the addition of new claims or parties.

-10-

FIRST AMENDED CLASS ACTION COMPLAINT

39.     The underlying allegations in this Complaint are based on Plaintiff's documents as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar.

### FACTUAL ALLEGATIONS

**A.     Defendants Paid Fidelity Unreasonable Fees, Failed to Monitor Fidelity, and make Requests for Proposals from Other Recordkeepers**

40.     Defendants have a duty to prudently select covered service providers ("CSPs"). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustee's fiduciary duty." 28 U.S.C. § 1108(b)(2) states that services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the importance of prudently selecting service providers.[3] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess . . . the reasonableness of the fees charged in light of the services provided." *Id*.

41.     Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated – a computer-based bookkeeping system.

42.     The costs for recordkeeping and administrative services are driven purely by the number of inputs and the number of transactions and therefore depend on the number of participants, not the amount of assets in the participant's account.

43.     The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to

---

[3] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

FIRST AMENDED CLASS ACTION COMPLAINT

contribute each pay period through automated payroll deductions.  Participants can go on-line and change their contribution rate at any time.

44.     Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

45.     Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

46.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

47.     Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids. Defendants did not do that here.

48.     The revenue sharing fees were not printed on participants' statements making it difficult for participants to evaluate whether they were paying excessive fees for recordkeeping services.

FIRST AMENDED CLASS ACTION COMPLAINT

49. Because revenue sharing payments are asset-based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in the payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other CSP) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply as a result of participants putting money aside biweekly for retirement. Additional funds come from interest, dividends and capital gains.

50. Based on the number of Plan participants and the assets in the Plan, a reasonable total recordkeeping fee for the Plan is approximately $40 per participant, as reflected in the 18th Annual NEPC 2023 Defined Contribution Plan & Fee Survey (available at https://www.nepc.com/wp-content/uploads/2024/03/2023-NEPC-DC-Plan-Trends-Fees-Report-Press-Release_Final.pdf). In other words, the appropriate aggregate amount for the Plan to pay for recordkeeping services may have equated to $40 per participant—or another amount subject to proof at trial—charged to the Plan as a whole.

51. That total Plan-level fee could then have been reasonably allocated among participants in proportion to the assets in each participant's account or through another equitable, tiered, or graduated structure. Rather, Plaintiffs allege that Defendants failed to ensure the Plan paid no more than a reasonable amount for recordkeeping, whether measured by industry-standard per-participant benchmarks or by applying a reasonable basis-point structure.

52. Plaintiffs have calculated the Plan's recordkeeping fees based on the direct and indirect compensation levels shown on the 408(b)(2) statements produce by Defendants.

53. Based on these calculations, the Plan paid Fidelity excessive and variable recordkeeping fees that were not tethered to the services provided.

FIRST AMENDED CLASS ACTION COMPLAINT

54.    For example, in 2019, the Plan paid Fidelity approximately $513,937 even though Fidelity had provided the same services for approximately 400 more participants for $438,165 the year before.

55.    Similarly, in 2016, the Plan paid Fidelity approximately $408,071 in recordkeeping fees for these same services with 1100 more participants than 2019.

56.    These variations in recordkeeping fees cannot be explained by the services provided – which did not materially change.

57.    Nor can these variations be explained by changes in participants as the number of Plan participants shrank slightly over time.

58.    Rather, as demonstrated in the charts and tables below, per participant recordkeeping fees swung wildly based largely on Plan Assets and only once fell to the $40 per person that represents a reasonable fee for recordkeeping services.

59.    Given that Fidelity was able to provide services for $40.00 in 2022, it should have been able to do so for other years.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

-14-

FIRST AMENDED CLASS ACTION COMPLAINT

**Chart No. 1**

Plan Loss from Excess Recordkeeping and Admin Fees (bps)

| Year | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|
| **Plan Information:** | | | | | | | | | |
| Total Plan Participants (from 408(b)(2)): | 7,984 | 7,652 | 7,321 | 6,904 | 6,947 | 7,065 | 6,690 | 6,280 | 6,214 |
| Plan Assets (from 408(b)(2)): | $453,412,469 | $528,402,242 | $486,850,324 | $571,040,880 | $674,971,050 | $736,063,817 | $595,151,621 | $678,026,676 | $767,859,607 |
| **Actual Fees:** | | | | | | | | | |
| Asset Basd RK and Admin Fee (Per Participant) | $51 | $62 | $60 | $74 | $66 | $65 | $40 | $49 | $56 |
| Asset Based RK and Admin Fee (bps) | 9.0 | 9.0 | 9.0 | 9.0 | 6.8 | 6.3 | 4.5 | 4.5 | 4.5 |
| Asset Based RK and Admin Fee ($) | $408,071 | $475,562 | $438,165 | $513,937 | $455,605 | $460,040 | $267,818 | $305,112 | $345,537 |
| **Reasonable Fees:** | | | | | | | | | |
| Reasonable Per Participant RK & Admin Fees ($/yr) | $40 | $40 | $40 | $40 | $40 | $40 | $40 | $40 | $40 |
| Reasonable Asset Based RK and Admin Fees (bps) | 7.0 | 5.8 | 6.0 | 4.8 | 4.1 | 3.8 | 4.5 | 3.7 | 3.2 |
| Reasonable Asset Based RK and Admin Fees ($) | $319,360.00 | $306,080.00 | $292,840.00 | $276,160.00 | $277,880.00 | $282,600.00 | $267,600.00 | $251,200.00 | $248,560.00 |
| **Loss:** | | | | | | | | | |
| Excess Fees (Per Participant) | $11 | $22 | $20 | $34 | $26 | $25 | $0 | $9 | $16 |
| Excess Fees at Plan Level (bps) | 2.0 | 3.2 | 3.0 | 4.2 | 2.6 | 2.4 | 0.0 | 0.8 | 1.3 |
| Excess Fees at Plan Level ($) | $88,711.22 | $169,482.02 | $145,325.29 | $237,776.79 | $177,725.46 | $177,439.89 | $218.23 | $53,912.00 | $96,976.82 |

Total Excess ($)   $1,147,567.72

Notes:
1) According to the Statement of Services and Compensation for the CORELOGIC, INC. 401(K) SAVINGS PLAN recordkeeping fees are based on revenue sharing, float revenue, and use of proprietary funds, less credits
2) Revenue sharing varies greatly between funds, ranging from 0.00% to 0.30%

60.    There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers vigorously compete for business by offering the best service for the best price.  Upon information and belief, Defendants did not make requests for proposals from other recordkeepers during the putative class period.

61.    The package of recordkeeping services the Plan received included standard recordkeeping services such as: government reporting services, plan

-15-

FIRST AMENDED CLASS ACTION COMPLAINT

sponsor support services, recordkeeping services, and plan investment services and reporting.

62.   The Plan did not receive any unique services or at a level of quality that would warrant fees greater than the competitive fees that would be offered by other providers.

63.   Recordkeeping services are largely standardized because the recordkeepers must provide these services at scale to a large number of plans and must comply with regulatory requirements.  They cannot offer bespoke sets of services to each individual plan.

64.   The bulk of the fee paid for recordkeeping services pays for core recordkeeping services that do not vary from plan to plan.

65.   For large plans like this Plan, recordkeeping services are offered in a bundle with standardized services including, but not limited to, recordkeeping, transaction processing, participant communications, plan document services to ensure compliance with new legal and regulatory requirements, plan consulting services including regarding investment selection, accounting and audit services such as Form 5500 preparation, and compliance support and testing.

66.   Some other services may be added on an ad-hoc basis including, loan processing, brokerage services, distribution services, and processing of qualified domestic relations orders but the addition of such services do not have a dramatic impact on the cost of recordkeeping services, if any, and would not explain the variable and excessive compensation received by Fidelity that was not tied to the specific services rendered.

67.   Here, the Administrative Services Agreement between Fidelity and the Plan confirms that CoreLogic received the types of services listed above and did not receive unique services from Fidelity.

FIRST AMENDED CLASS ACTION COMPLAINT

68.    The market for defined contribution recordkeeping services is highly competitive, particularly for a Plan like the CoreLogic Plan with large numbers of participants and a large amount of assets.

69.    The unreasonable fees paid to Fidelity through revenue sharing arrangements directly resulted from the Defendants' choice of improper mutual fund share classes and failing to monitor the fees paid to Fidelity.

70.    The mutual funds paid annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized lower returns on their investments because they paid higher fund operating expenses.

71.    Fidelity's fees so far exceeded reasonable recordkeeping fees to the point that no differentiation in services could explain the level of recordkeeping fees paid by the Plan.

72.    The clear explanation for this is that Defendants have a flawed and reckless provider selection process that is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart Stores*, 588 F.3d 585, 596 (8th Cir. 2009).

73.    As discussed below, in most years, many of the funds offered to the participants had less expensive share classes available. Defendant's use of higher cost share classes to pay service provider costs is the most inequitable, inefficient and expensive method available.

74.    Defendants clearly failed to use the Plan's bargaining power to leverage Fidelity to charge lower administrative fees for the Plan participants or by bidding the Plan out to other service providers.

75.    Defendants further failed to take any or adequate action to monitor, evaluate or reduce their service provider fees, such as:

   a.  Choosing mutual fund share classes with lower revenue sharing for the Plan;

-17-
FIRST AMENDED CLASS ACTION COMPLAINT

     b.  monitoring costs including making requests for proposals from other service providers to compare with the costs being charged for similar sized plans in the marketplace; or

     c.  ensure the Participants were not being charged excessive fees.

76.    The amount of compensation paid to Fidelity vastly exceeds any DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit."

77.    In sum, the Plan unreasonably paid Fidelity fees far in excess of what the Plan needed to pay for their services and these fees were not tethered to the actual services rendered, but rather varied based on revenue sharing of a larger corpus of Plan funds over time.

78.    ERISA holds fiduciaries "to a high standard of care and diligence" regarding fees: Fiduciaries must, among other things, "[e]stablish a prudent process for selecting investment options and service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor investment options and service providers once selected to make sure they continue to be appropriate choices." Additionally, The Department of Labor has consistently reminded ERISA fiduciaries of their responsibilities to carefully evaluate fees when selecting plan investment options and then monitor fees on an ongoing basis. Defendants breached their fiduciary duties by failing to conduct themselves accordingly.

**B.**  **Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options**

79.    An ERISA fiduciary's evaluation of plan investments must be focused solely on economic considerations that have a material effect on the risk and return of an investment based on appropriate investment horizons, consistent with the plan's funding policy and investment policy objectives. The corollary principle is

that ERISA fiduciaries must never sacrifice investment returns, take on additional investment risk, or pay higher fees to promote non-pecuniary benefits or goals.

80.     A fiduciary may not subordinate the interests of the participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives, and may not sacrifice investment return or take on additional investment risk to promote non-pecuniary benefits or goals such as to seek to burden participants/beneficiaries with fund expenses such as SEC Rule 12b-1 fees, subtransfer agency fees, shareholder servicing fees, commissions, finder's (incentive) fees or other types of fees just so their selected covered service providers are paid from participants/beneficiaries.

81.     The weight given to any pecuniary factor by a fiduciary should appropriately reflect a prudent assessment of its impact on risk-return. Revenue sharing always costs more (evidence follows) than the credit the Defendants are seeking to offset the receipt of an invoice by their chosen covered service providers.

82.     In the context of ERISA retirement plans such interests must be understood to refer to "financial" rather than "nonpecuniary" benefits, and Federal appellate courts have described ERISA's fiduciary duties as "the highest known to the law."

83.     Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

84.      Mutual funds often offer multiple "classes" of their shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will charge different operating expenses depending on the class.

85.      A mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund to one share class, while charging a higher class share in that same

FIRST AMENDED CLASS ACTION COMPLAINT

fund an expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan.

86.     Plans that invest their participants' funds in lower share classes and subject them to higher fees engage in share class violations which are the most clear and obvious breaches of fiduciary duties in the Plan. *See Tibble v. Edison*, 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017) ("Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.").

87.     Since at least 2017, Defendants have offered higher cost mutual fund share classes as investment options for the Plan even though at all times lower cost class shares of those exact same mutual funds were readily available to the Plan.

88.     Indeed, Defendants have provided as many as 25 fund choices with clear share class violations.

89.     Defendants selected the Plan's investment options. In this case, on information and belief, Fidelity, the Plan's recordkeeper, and NFP, the Plan's investment advisor, provided Defendants with a universe of pooled investment options from which to select a subset to offer Plaintiff and the other Plan participants.

90.     Defendants chose and continued to maintain a pool of investment options, including those offered by Fidelity and NFP at the expense of participants and beneficiaries of the Plan by routinely offering higher cost share classes rather than readily available lower cost options.

-20-

FIRST AMENDED CLASS ACTION COMPLAINT

## Chart No. 2

**Summary Table**

|  | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 |
|---|---|---|---|---|---|---|---|---|
| Total Funds # | 28 | 28 | 28 | 28 | 28 | 27 | 27 | 27 |
| Cheaper Shares Classes Available # | 6 | 6 | 24 | 25 | 25 | 24 | 24 | 24 |
| Cheaper Shares Classes Available % | 21% | 21% | 86% | 89% | 89% | 89% | 89% | 89% |

91.    Every fund invested in expensive share classes was imprudently selected and retained.   In this regard, evaluation of certain exemplar funds shows that Defendants' selection and retention of expensive share classes reflected a lack of prudent processes because investing in expensive share classes causes return lags compared to investments in less expensive share classes and offers the Plan no pecuniary benefit and the Plan could easily have switched to the less expensive share classes but failed to do so.

92.    The use of expensive share classes was likely motivated by an improper desire to hide fees from Plan participants by using revenue sharing to pay fees instead of directly drawing them from the Plan or Defendants being billed directly for the fees.  But as demonstrated below, the fund invested in share classes that charged excess fees which created a drag on fund performance that was not justified by the desire to generate fees for revenue sharing.

93.    Rather than benefiting the Plan, the use of expensive share classes benefits service providers at the expense of the Plan because it generates excess fees which are only partially rebated over a period of time to the Plan and may also generate additional kickbacks to the service providers.

94.    A prudent fiduciary would have recognized that the investment in an expensive share class was directly eroding the Plan's gains from the investments and would have switched to the cheaper share class.

95.    Other fiduciaries in similar circumstances have migrated Plan funds to cheaper share classes in recognition of the fact that investment in the more expensive share class is not in the pecuniary interest of the Plan.

-21-

FIRST AMENDED CLASS ACTION COMPLAINT

96. The following chart illustrates the differences in the operating costs and returns between the share classes chosen by Defendants and the least expensive share class available as of January 1, 2017 for funds that were in the Plan through the date they were removed or through the the entire six year period ending December 31, 2024.

97. The fund name listed in the first row and shaded grey represents the share class chosen by Defendants. The second fund name listed and <u>not</u> shaded represents the cheaper share class Defendants should have chosen which was available to them throughout the duration of the Plan. The bolded line represents the difference in costs (expenses charged), 12-month yield and the investment returns for and six year performance periods ending 12/31/2024.

98. Additionally, to highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the six- year cumulative returns are included, which shows the compounding effect of excess fees paid over the course of each year.

**Chart No. 3**

| Year Selected | Last Full Year in the Plan | Name | Expense Ratio % | Cumulative Total Returns Years in Plan Beginning in 2017 | | Cost to Participants during SOL Period# |
|---|---|---|---|---|---|---|
| | | | | 6-Year Total* | % / Years * | |
| 2014 | 2022 | T. Rowe Price Equity Index 500 | 0.18 | 88.91 | | |
| | | T. Rowe Price Equity Index 500 I | 0.05 | 90.44 | | |
| | | *Cost of Expensive Share Classes* | *-0.13* | *-1.53* | *-0.25* | ($544,425.43) |
| 2015 | In Plan | JPMorgan US Research Enhanced Equity I | 0.35 | 210.41 | | |
| | | JPMorgan US Research Enhanced Equity R6 | 0.25 | 212.94 | | |
| | | *Cost of Expensive Share Classes* | *-0.10* | *-2.53* | *-0.32* | ($577,501.58) |
| 2012 | In Plan | MFS Growth R4 | 0.58 | 271.24 | | |
| | | MFS Growth R6 | 0.49 | 273.99 | | |
| | | *Cost of Expensive Share Classes* | *-0.09* | *-2.74* | *-0.34* | ($756,656.15) |

-22-

FIRST AMENDED CLASS ACTION COMPLAINT

| Year Selected | Last Full Year in the Plan | Name | Expense Ratio % | Cumulative Total Returns Years in Plan Beginning in 2017 | | Cost to Participants during SOL Period# |
|---|---|---|---|---|---|---|
| | | | | 6-Year Total* | % / Years * | |
| 2019 | 2022 In Plan | JPMorgan Equity Income R5 | 0.63 | 61.63 | | |
| | | JPMorgan Equity Income R6 | 0.53 | 62.26 | | |
| | | *Cost of Expensive Share Classes* | *-0.10* | *-0.63* | *-0.16* | ($23,521.93) |
| 2012 | 2018 | T. Rowe Price Equity Income | 0.63 | 5.37 | | |
| | | T. Rowe Price Equity Income I | 0.53 | 5.59 | | |
| | | *Cost of Expensive Share Classes* | *-0.10* | *-0.22* | *-0.11* | ($8,152.43) |
| 2020 | 2022 | iShares Russell 2000 Small-Cap Index Instl | 0.12 | 9.58 | | |
| | | iShares Russell 2000 Small-Cap Index K | 0.07 | 9.75 | | |
| | | *Cost of Expensive Share Classes* | *-0.05* | *-0.17* | *-0.06* | ($50,497.69) |
| 2014 | 2019 | JPMorgan US Small Company L | 0.81 | 17.03 | | |
| | | JPMorgan US Small Company R6 | 0.72 | 17.32 | | |
| | | *Cost of Expensive Share Classes* | *-0.09* | *-0.29* | *-0.10* | ($104,312.22) |
| 2012 | 2021 | Janus Henderson Triton I | 0.76 | 113.20 | | |
| | | Janus Henderson Triton N | 0.66 | 114.33 | | |
| | | *Cost of Expensive Share Classes* | *-0.10* | *-1.13* | *-0.23* | ($276,541.58) |
| 2015 | 2019 | PGIM Quant Solutions Small-Cap Value Z | 0.79 | 2.69 | | |
| | | PGIM Quant Solutions Small-Cap Value R6 | 0.67 | 2.88 | | |
| | | *Cost of Expensive Share Classes* | *-0.12* | *-0.19* | *-0.06* | ($7,405.47) |
| 2017 | In Plan | Hartford International Opportunities Y | 0.79 | 65.15 | | |
| | | Hartford International Opportunities R6 | 0.50 | 66.11 | | |
| | | *Cost of Expensive Share Classes* | *-0.29* | *-0.96* | *-0.12* | ($194,851.46) |
| 2010 | In Plan | Fidelity Low-Priced Stock | 0.89 | 76.11 | | |
| | | Fidelity Low-Priced Stock K6 (2018) | 0.50 | 80.54 | | |
| | | *Cost of Expensive Share Classes* | *-0.39* | *-4.43* | *-0.63* | ($1,061,435.31) |
| 2014 | 2022 | iShares MSCI EAFE Intl Index Inv A | 0.34 | 34.23 | | |
| | | iShares MSCI EAFE Intl Index Inv K | 0.04 | 36.77 | | |
| | | *Cost of Expensive Share Classes* | *-0.30* | *-2.53* | *-0.42* | ($146,201.41) |

-23-

FIRST AMENDED CLASS ACTION COMPLAINT

| Year Selected | *Last Full Year in the Plan* | Name | Expense Ratio % | Cumulative Total Returns Years in Plan Beginning in 2017 | | Cost to Participants during SOL Period# |
|---|---|---|---|---|---|---|
| | | | | 6-Year Total* | % / Years * | |
| 2015 | In Plan | Allspring Core Bond Inst | 0.38 | 11.81 | | |
| | | Allspring Core Bond R6 | 0.33 | 12.26 | | |
| | | *Cost of Expensive Share Classes* | *-0.05* | *-0.44* | *-0.06* | ($7,729.23) |
| 2010 | In Plan | Fidelity Balanced | 0.47 | 67.20 | | |
| | | Fidelity Balanced K6 (2020) | 0.32 | 69.31 | | |
| | | *Cost of Expensive Share Classes* | *-0.15* | *-2.11* | *-0.42* | ($685,246.01) |
| 2014 | 2022 | T. Rowe Price Retirement 2005 | 0.49 | 27.86 | | |
| | | T. Rowe Price Retirement I 2005 I | 0.34 | 28.90 | | |
| | | *Cost of Expensive Share Classes* | *-0.15* | *-1.04* | *-0.17* | ($8,678.15) |
| 2014 | 2022 | T. Rowe Price Retirement 2010 | 0.49 | 30.83 | | |
| | | T. Rowe Price Retirement I 2010 I | 0.34 | 31.92 | | |
| | | *Cost of Expensive Share Classes* | *-0.15* | *-1.09* | *-0.18* | ($14,066.86) |
| 2014 | 2022 | T. Rowe Price Retirement 2015 | 0.51 | 34.95 | | |
| | | T. Rowe Price Retirement I 2015 I | 0.36 | 36.01 | | |
| | | *Cost of Expensive Share Classes* | *-0.15* | *-1.06* | *-0.18* | ($52,564.05) |
| 2014 | 2022 | T. Rowe Price Retirement 2020 | 0.53 | 40.14 | | |
| | | T. Rowe Price Retirement I 2020 I | 0.37 | 41.23 | | |
| | | *Cost of Expensive Share Classes* | *-0.16* | *-1.09* | *-0.18* | ($183,808.95) |
| 2014 | 2022 | T. Rowe Price Retirement 2025 | 0.55 | 45.37 | | |
| | | T. Rowe Price Retirement I 2025 I | 0.39 | 46.39 | | |
| | | *Cost of Expensive Share Classes* | *-0.16* | *-1.01* | *-0.17* | ($239,362.82) |
| 2014 | 2022 | T. Rowe Price Retirement 2030 | 0.58 | 49.81 | | |
| | | T. Rowe Price Retirement I 2030 I | 0.41 | 50.84 | | |
| | | *Cost of Expensive Share Classes* | *-0.17* | *-1.03* | *-0.17* | ($295,820.66) |
| 2014 | 2022 | T. Rowe Price Retirement 2035 | 0.59 | 53.73 | | |
| | | T. Rowe Price Retirement I 2035 I | 0.42 | 54.89 | | |
| | | *Cost of Expensive Share Classes* | *-0.17* | *-1.16* | *-0.19* | ($279,627.70) |
| 2014 | 2022 | T. Rowe Price Retirement 2040 | 0.60 | 57.24 | | |
| | | T. Rowe Price Retirement I 2040 I | 0.43 | 58.44 | | |
| | | *Cost of Expensive Share* | *-0.17* | *-1.21* | *-0.20* | ($242,390.28) |

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

| Year Selected | *Last Full Year in the Plan* | Name | Expense Ratio % | Cumulative Total Returns Years in Plan Beginning in 2017 | | Cost to Participants during SOL Period# |
|---|---|---|---|---|---|---|
| | | | | 6-Year Total* | % / Years * | |
| | | *Classes* | | | | |
| 2014 | 2022 | T. Rowe Price Retirement 2045 | 0.62 | 59.60 | | |
| | | T. Rowe Price Retirement I 2045 I | 0.44 | 60.71 | | |
| | | *Cost of Expensive Share Classes* | *-0.18* | *-1.12* | *-0.19* | ($152,743.77) |
| 2014 | 2022 | T. Rowe Price Retirement 2050 | 0.63 | 59.57 | | |
| | | T. Rowe Price Retirement I 2050 I | 0.45 | 60.70 | | |
| | | *Cost of Expensive Share Classes* | *-0.18* | *-1.13* | *-0.19* | ($68,694.72) |
| 2014 | 2022 | T. Rowe Price Retirement 2055 | 0.64 | 59.11 | | |
| | | T. Rowe Price Retirement I 2055 I | 0.46 | 60.61 | | |
| | | *Cost of Expensive Share Classes* | *-0.18* | *-1.50* | *-0.25* | ($22,603.86) |
| 2014 | 2022 | T. Rowe Price Retirement 2060 | 0.64 | 59.10 | | |
| | | T. Rowe Price Retirement I 2060 I | 0.46 | 60.77 | | |
| | | *Cost of Expensive Share Classes* | *-0.18* | *-1.67* | *-0.28* | ($2,100.98) |
| 2021 | 2022 | T. Rowe Price Retirement 2065 | 0.64 | -4.59 | | |
| | | T. Rowe Price Retirement I 2065 I | 0.46 | -4.11 | | |
| | | *Cost of Expensive Share Classes* | *-0.18* | *-0.48* | *-0.24* | ($187.75) |
| | | | | | | **($6,007,128.45)** |

*\*The 6-Year %/6 illustrate that the cost to participants in lost returns is typically greater than the revenue sharing costs. This lost return differential is not adequately expressed in the annualized figures. Funds selected after 2017 are divided by the number of full years they were in the Plan.*

*# Assets used in the calculation were as of the beginning of the limitations period or year they were added in the plan, if later*

99.     Defendants may seek to explain that they offered higher cost share classes with higher fee burdens by pointing to the Plan's ability to use those fees for revenue sharing arrangements. But this does not justify the increased fees and lost

-25-

FIRST AMENDED CLASS ACTION COMPLAINT

returns imposed on Plan participants. Rather, empirically speaking, revenue sharing burdens on mutual fund investors are *always* more costly than the revenue sharing credit offered by the corresponding mutual fund share class.

100. In other words, investing Plan assets in higher cost share classes does not benefit plan participants because it causes them to pay excess indirect fees which are not tethered to any service provided to Plan participants but rather are tied to the amounts invested by Plan participants.

101. The use of share classes to create funds for revenue sharing does not justify the increased fees and lost returns imposed on Plan participants. Rather, empirically speaking, revenue sharing burdens on mutual fund investors are always more costly over time than the revenue sharing credit offered by the corresponding mutual fund share class.

102. In addition, because rebates are only made after a set period of time, the Plan effectively lends out the rebated funds until such time as the rebate comes through, rather than keeping them in the Trust and accruing gains during that time.

103. Moreover, Plan participants are generally not aware of the fee burden that their 401k accounts bear from indirect fees. Unlike direct fees, which are clearly listed on participants' statements, indirect fees are unshown and unknown to those paying those costs.

104. Indeed, because not all funds generate fees for revenue sharing, only those participants invested in the revenue sharing funds pay for the revenue sharing and the other participants get a free ride – which is impermissible discrimination against participants.

105. Likewise, the rebate formula used may not equitably return funds to participants if participants make withdrawals or transfer out of the fund prior to the credit being posted.

106. Further, by focusing on funds with expensive share classes that generated high funds for revenue sharing, the Plan limited the universe of funds

-26-
FIRST AMENDED CLASS ACTION COMPLAINT

available for selection and selects funds based on revenue generating share classes as opposed to the best interests of the Plan itself.

107.   Because the Plan could have invested in identical mutual funds with a lower cost share class, the Defendants' actions were directly erosive to the trust's growth.

108.   Defendants thus caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also caused lost yield and returns as a result of those higher fees on many of the mutual funds offered through the Plan. The erosive effect of excessive fees and the resulting lost returns compound over time substantially lowering the corpus of participants' retirement investments.

109.   In selecting share classes with higher fees, Defendants demonstrated a lack of basic skill and prudence when selecting investments.

110.   Not only did the Defendants fail to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants, they did not need to as the fund assets qualified them to meet any minimum initial investment requirements. Furthermore, to the extent they did not explicitly meet the minimum asset requirement, many mutual fund companies will waive those requirements in qualified plans.

111.   Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class and to make the assessments noted above was made available in each fund's annual prospectus at the time the choices were made and Defendants also could and should have had processes in place to monitor the share classes of the Plan's investments but failed to put in place such processes.

112.   The Defendants' actions to choose high-cost funds demonstrates a lack of prudence. For example, as shown in the chart above, the JPMorgan US Research Enhanced Equity I expensive share class had fees of thirty-five basis points (0.35%/yr) as opposed to the share class with lower fees of twenty-five basis points

(0.25%/yr). The total fees paid for the share class used in the Plan was therefore ten basis points (0.10%/yr) than the lowest cost option.

113.   In other words, Defendants caused Plan participants who invested in that JPMorgan US Research Enhanced Equity fund to pay .10% more in fees than necessary and permitted plan's contracted recordkeeper and/or financial advisor to collect a portion of those increased fees.

114.   Likewise with the iShares MSCI EAFE Intl Idx fund, Defendants chose the higher fee Inv A share class that had fees of thirty-four basis points (0.34%/yr) as opposed to the share class with lower fees of four basis points (0.04%/yr). The total fees paid for the share class with higher fees was therefore thirty basis points per year (0.30%/yr).

115.   Additionally, an analysis of each attribute of the different share classes reveals that there is no difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.

116.   Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to "minimize costs." Uniform Prudent Investor Act (the "UPIA") §7.

117.   As is evident from the allegations in the Complaint, Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by the offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available.

118.   A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at

FIRST AMENDED CLASS ACTION COMPLAINT

the earliest opportunity.   The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in millions of dollars of damages to participants.

**C.    Each Plaintiff Incurred Excessive Recordkeeping Fees and Experienced Diminished Returns Due to Investment in a Higher-Cost Share Class**

**I.  Plaintiff Sabana Incurred Excessive Recordkeeping Fees.**

119.   Plaintiff Sabana was a participant in the Plan during the Relevant Period and personally paid excessive recordkeeping and administrative fees. These fees were not tethered to the actual cost of services provided but instead varied with asset size. Importantly, the fee calculations set forth below already account for revenue credits received, so they reflect Plaintiff Sabana's net costs.

120.   The Plan's contractual recordkeeping fee declined throughout the class period: nine (9) basis points in 2019, 6.8 basis points in 2020, 6.3 basis points in 2021, and 4.5 basis points beginning in 2022. This decline demonstrates that Fidelity was capable of providing the exact same services for 4.5 basis points all along. At minimum, Defendants should have enforced that lower rate throughout the class period. Instead, Plaintiff Sabana and other participants paid inflated fees for years before the contractual rate finally reached the level Fidelity was already capable of delivering.

121.   The following chart summarizes Plaintiff Sabana's actual recordkeeping and administrative fees by quarter and year, alongside: (i) what a reasonable pro rata fee would have been based on market benchmarks, (ii) the contractual Fidelity fee in effect at the time, and (iii) Fidelity's current stated fee of 4.5 basis points. This chart demonstrates that Plaintiff Sabana consistently paid more than both the contractual rate and what a  rudent fiduciary would have negotiated.

-29-
FIRST AMENDED CLASS ACTION COMPLAINT

122.    **Chart No. 5** – Plaintiff Sabana's Actual Fees Compared to Reasonable and Contractual Fees (Net of Revenue Credits)

| Quarter | Quarterly | | Actual Paid by Plaintiff | Reasonable Fee $40/part Prorated | Contractual Fidelity RK & Admin Fee Rate | Current Fidelity Fee 4.5bp |
|---|---|---|---|---|---|---|
| 2019 Q2 | 0.27 | **2019** | **1.64** | **0.55** | **1.03** | **0.52** |
| 2019 Q3 | 0.62 | *Difference* | | *1.09* | *0.61* | *1.12* |
| 2019 Q4 | 0.75 | | | | | |
| 2020 Q1 | 0.39 | **2020** | **5.16** | **2.72** | **4.48** | **2.99** |
| 2020 Q2 | 1.53 | *Difference* | | *2.44* | *0.68* | *2.17* |
| 2020 Q3 | 2.11 | | | | | |
| 2020 Q4 | 1.13 | | | | | |
| 2021 Q1 | 4.89 | **2021** | **16.59** | **5.25** | **8.63** | **6.21** |
| 2021 Q2 | 5.22 | *Difference* | | *11.34* | *7.96* | *10.38* |
| 2021 Q3 | 5.18 | | | | | |
| 2021 Q4 | 1.30 | | | | | |
| 2022 Q1 | 5.05 | **2022** | **7.10** | **5.33** | **5.33** | **5.33** |
| 2022 Q2 | (0.48) | *Difference* | | *1.77* | *1.77* | *1.77* |
| 2022 Q3 | 4.03 | | | | | |
| 2022 Q4 | (1.51) | | | | | |
| 2023 Q1 | 4.67 | **2023** | **12.47** | **4.87** | **5.92** | **5.92** |
| 2023 Q2[3] | 0.00 | *Difference* | | *7.60* | *6.55* | *6.55* |
| 2023 Q3 | 6.44 | | | | | |
| 2023 Q4 | 1.36 | | | | | |
| 2024 Q1 | 6.50 | **2024** | **21.38** | **5.09** | **7.16** | **7.16** |
| 2024 Q2 | 6.66 | *Difference* | | *16.29* | *14.22* | *14.22* |
| 2024 Q3 | 6.72 | | | | | |
| 2024 Q4 | 1.50 | | | | | |
| 2025 Q1 | 6.85 | **2025** | **6.85** | **1.30** | **1.83** | **1.83** |
| | | *Difference* | | *5.55* | *5.02* | *5.02* |
| | | | | | | |
| *Total Net Fee Paid by Sabana* | *71.18* | *Total* | | *46.08* | *36.81* | *41.23* |

[1]Ending Balance Per Account Statement
[2] 408(b)(2) Disclosures (Annual Administrative Services Revenue)
[3] Plan begins utilizing direct fees, no fee shown in the second quarter of 2023
[4] Contractual fees: (2016 - 2019 - 0.09%, 2020 - 0.0675, 2021 - 0.0625, 2022 - 2025 - 0.045%)
[5] Revenue sharing applied from previously held fund

-30-

FIRST AMENDED CLASS ACTION COMPLAINT

6 The reasonable $40 pro-rata fee is based on the calculations in Chart 1 of the Proposed FAC, row for Reasonable Asset Based RK/Admin Fee

123.   For example, in 2019 Plaintiff Sabana paid $1.64 in recordkeeping fees across three quarters ($0.27 in Q2, $0.62 in Q3, and $0.75 in Q4). A reasonable pro rata fee for 2019 would have been $0.55, the Plan's contractual rate at nine (9) basis points translated to $1.03, and the same services could have been provided at 4.5 basis points for only $0.52. Plaintiff Sabana therefore overpaid by $0.61 above the contractual rate, $1.09 above a reasonable fee, and $1.12 above the rate Fidelity itself later adopted.

124.   Plaintiff Sabana's overcharges continued in subsequent years. In 2020, he paid $5.16 compared to $4.48 under the contractual rate, $2.72 under a reasonable fee, and $2.99 at 4.5 bps. In 2021, he paid $16.59 compared to $8.63 under the contractual rate, $5.25 under a reasonable fee, and $6.21 at 4.5 bps. In 2022, he paid $7.10 compared to $5.33 under both the contractual rate and a reasonable fee, and again $5.33 at 4.5 bps. In 2023, he paid $12.47 compared to $5.92 under the contractual rate, $4.87 under a reasonable fee, and $5.92 at 4.5 bps. In 2024, he paid $21.38 compared to $7.16 under the contractual rate, $5.09 under a reasonable fee, and $7.16 at 4.5 bps. And in 2025, he paid $6.85 compared to $1.83 under the contractual rate, $1.30 under a reasonable fee, and $1.83 at 4.5 bps.

125.   As shown in Chart No. 5, Plaintiff Sabana's cumulative overpayments during the Relevant Time Period total:

$46.08 more than a reasonable pro rata fee;

$36.81 more than the contractual Fidelity rate; and

$41.23 more than Fidelity's current 4.5 basis point fee.

126.   Plaintiff Sabana's injuries are concrete and particularized. He personally paid more than both the contractual recordkeeping fee and what a reasonable fiduciary would have negotiated, directly reducing his account balance and the

-31-

FIRST AMENDED CLASS ACTION COMPLAINT

compounding growth of his retirement savings. The fact that some revenue credits were later provided does not cure these losses. Money was first removed from his account, depriving him of the opportunity for those funds to remain invested and grow. Any later credits merely offset part of the harm after the fact; they did not restore the lost investment growth or eliminate Defendants' imprudent fee practices. Plaintiff Sabana therefore has Article III standing to pursue the claims asserted herein.

## II. Plaintiff Sabana Lost Compounded Returns Due to Defendants' Imprudent Selection of Higher-Cost Share Classes.

127.   Plaintiff Sabana was invested in the T. Rowe Price Retirement 2050 Fund during the Relevant Period. Defendants selected and retained a higher-cost retail share class of that fund when a materially lower-cost institutional share class of the exact same fund was available to the Plan. The underlying investments, manager, and strategy were identical; the only difference was cost.

128.   For example, during the class period the higher-cost share class in which Plaintiff Sabana was invested charged an expense ratio of approximately 0.63%, while the lower-cost institutional class charged an expense ratio of approximately 0.45%. The 18-basis point differential was pure waste—an unnecessary expense that provided no additional benefit to participants.

129.   Plaintiff Sabana personally bore these higher expenses through reduced net returns in his account. For the four years he invested in this fund, the higher-cost share class caused Plaintiff Sabana's account to underperform by an average of approximately 18-19 basis points per year.  These losses compounded annually, eroding Plaintiff Sabana's retirement savings throughout the Relevant Time Period. Even though Plaintiff Sabana received revenue credits, those credits did not cure his injury. Money was first removed from his account, depriving him of the opportunity for those dollars to remain invested and compound. Any later credits merely offset

-32-
FIRST AMENDED CLASS ACTION COMPLAINT

part of the harm after the fact; they did not restore the lost investment growth or eliminate the structural imprudence of Defendants' fee practices.

130.   Just as with recordkeeping fees, Defendants could have eliminated these losses entirely by selecting the lower-cost institutional class. At minimum, a prudent fiduciary would have monitored the Plan's investments and moved participants into the lower-cost class once it was available.

131.   Plaintiff Sabana's losses from Defendants' share class decisions are concrete and particularized. He suffered diminished returns that reduced his account balance and foregone compounded growth, harms that are actual and ongoing—not hypothetical. These injuries establish Article III standing for Plaintiff Sabana to challenge Defendants' imprudent share class selection.

### III. Plaintiff Fikse Incurred Excessive Recordkeeping Fees.

132.   Plaintiff Fikse was a participant in the Plan during the Relevant Period and personally paid excessive recordkeeping and administrative fees. These fees were not tethered to the actual cost of services provided but instead varied with asset size. Importantly, the fee calculations set forth below already account for revenue credits received, so they reflect Plaintiff Fikse's net costs.

133.   The Plan's contractual recordkeeping fee declined throughout the class period: nine (9) basis points in 2019, 6.8 basis points in 2020, 6.3 basis points in 2021, and 4.5 basis points beginning in 2022. This decline demonstrates that Fidelity was capable of providing the exact same services for 4.5 basis points all along. At minimum, Defendants should have enforced that lower rate throughout the class period. Instead, Plaintiff Fikse and other participants paid inflated fees for years before the contractual rate finally reached the level Fidelity was already capable of delivering.

-33-
FIRST AMENDED CLASS ACTION COMPLAINT

134.    The following chart summarizes Plaintiff Fikse's actual recordkeeping and administrative fees by quarter and year, alongside: (i) what a reasonable pro rata fee would have been based on market benchmarks, (ii) the contractual Fidelity fee in effect at the time, and (iii) Fidelity's current stated fee of 4.5 basis points. This chart demonstrates that Plaintiff Fikse consistently paid more than both the contractual rate and what a prudent fiduciary would have negotiated.

135.    **Chart No. 6** – Plaintiff Fikse's Actual Fees Compared to Reasonable and Contractual Fees (Net of Revenue Credits)

| Quarter | Quarterly | | Actual Paid by Plaintiff | Reasonable Fee $40/part Prorated | Contractual Fidelity RK & Admin Fee Rate | Current Fidelity Fee 4.5bp |
|---|---|---|---|---|---|---|
| 2016 Q1 | 8.62 | 2016 | 101.76 | 90.39 | 116.22 | 58.11 |
| 2016 Q2 | 45.55 | Difference | | 11.37 | -14.46 | 43.65 |
| 2016 Q3 | 13.82 | | | | | |
| 2016 Q4 | 33.78 | | | | | |
| 2017 Q1 | 52.75 | 2017 | 184.80 | 92.05 | 142.84 | 71.42 |
| 2017 Q2 | 41.24 | Difference | | 92.75 | 41.97 | 113.38 |
| 2017 Q3 | 59.89 | | | | | |
| 2017 Q4 | 30.92 | | | | | |
| 2018 Q1 | 64.98 | 2018 | 194.61 | 109.98 | 164.98 | 82.49 |
| 2018 Q2 | 51.85 | Difference | | 84.62 | 29.63 | 112.12 |
| 2018 Q3 | 55.59 | | | | | |
| 2018 Q4 | 22.19 | | | | | |
| 2019 Q1 | 44.81 | 2019 | 44.81 | 24.12 | 45.22 | 22.61 |
| | | Difference | | 20.70 | -0.41 | 22.20 |
| | | | | | | |
| Total Net Fee Paid by Fikse | 525.99 | Total | | 209.44 | 56.73 | 291.36 |

[1]Ending Balance Per Account Statement
[2] 408(b)(2) Disclosures (Annual Administrative Services Revenue)
[3] Plan begins utilizing direct fees, no fee shown in the second quarter of 2023
[4] Contractual fees: (2016 - 2019 - 0.09%, 2020 - 0.0675, 2021 - 0.0625, 2022 - 2025 - 0.045%)
[5] The reasonable $40 pro-rata fee is based on the calculations in Chart 1 of the Proposed FAC, row for Reasonable Asset Based RK/Admin Fee

-34-

FIRST AMENDED CLASS ACTION COMPLAINT

136.   For example, in 2016 Plaintiff Fikse paid $101.76 in recordkeeping fees. A reasonable pro rata fee for 2016 would have been $90.39, the Plan's contractual rate translated to $116.22, and the same services could have been provided at 4.5 basis points for only $58.11. Plaintiff Fikse therefore overpaid by $11.37 above the reasonable fee, while also paying $43.65 more than what Fidelity itself later charged for the exact same services.

137.   In 2017, she paid $184.80 compared to $92.05 under a reasonable fee, $142.84 under the contractual rate, and $71.42 at 4.5 bps. In 2018, she paid $194.61 compared to $109.98 under a reasonable fee, $164.98 under the contractual rate, and $82.49 at 4.5 bps. In 2019, she paid $44.81 compared to $24.12 under a reasonable fee, $45.22 under the contractual rate, and $22.61 at 4.5 bps.

138.   As shown in Chart No. 6, Plaintiff Fikse's cumulative overpayments during the Relevant Period total:

$209.44 more than a reasonable pro rata fee;

$56.73 more than the contractual Fidelity rate; and

$291.36 more than Fidelity's current 4.5 basis point fee.

139.   Plaintiff Fikse's injuries are concrete and particularized. She personally paid more than both the contractual recordkeeping fee and what a reasonable fiduciary would have negotiated, directly reducing her account balance and the compounding growth of her retirement savings. The fact that some revenue credits were later provided does not cure these losses. Money was first removed from her account, depriving her of the opportunity for those funds to remain invested and grow. Any later credits merely offset part of the harm after the fact; they did not restore the lost investment growth or eliminate Defendants' imprudent fee practices. Plaintiff Fikse therefore has Article III standing to pursue the claims asserted herein.

//

-35-

FIRST AMENDED CLASS ACTION COMPLAINT

## IV. **Plaintiff Fikse Lost Compounded Returns Due to Defendants' Imprudent Selection of Higher-Cost Share Classes.**

140.   Plaintiff Fikse was invested in the MFS Growth R4 Fund, the Fidelity Balanced Fund, and the T. Rowe Price Retirement 2020 Fund during the Relevant Period. In each instance, Defendants selected and retained a higher-cost retail share class of the exact same fund when a materially lower-cost institutional share class was available to the Plan. The underlying investments, managers, and strategies were identical; the only difference was cost.

141.   For example, during the years she was invested, the MFS Growth R4 share class charged an expense ratio of 0.58%, while the materially identical MFS Growth R6 class charged only 0.49%. Likewise, the Fidelity Balanced Fund charged 0.47% compared to 0.39% in its institutional K class, and the T. Rowe Price Retirement 2020 Fund charged 0.53% compared to 0.37% in its institutional I class. These differentials—ranging from 8 to 16 basis points annually—were pure waste, providing no additional benefit to participants.

142.   Plaintiff Fikse personally bore these higher expenses through reduced net returns in her account. The higher-cost share classes caused her investments to underperform by an average of approximately 10 to 15 basis points per year. Over the three years she was in the Plan, these losses compounded annually, eroding her retirement savings. Even though Plaintiff Fikse received revenue credits, those credits did not cure her injury. Money was first withdrawn from her account, depriving her of the opportunity for those funds to remain invested and compound. Any later credits merely offset part of the harm after the fact; they did not restore the lost investment growth or eliminate the structural imprudence of Defendants' fee practices.

143.   Just as with recordkeeping fees, Defendants could have eliminated these losses entirely by selecting the lower-cost institutional share classes. At minimum, a

prudent fiduciary would have monitored the Plan's investments and moved participants into the lower-cost classes once they were available.

144.    Plaintiff Fikse's losses from Defendants' share-class decisions are concrete and particularized. She suffered diminished returns that reduced her account balance and foregone compounded growth during her years in the Plan. These harms are actual and ongoing, not hypothetical, and they establish Article III standing for Plaintiff Fikse to challenge Defendants' imprudent share-class selections.

### V.    **Plaintiff Biera Incurred Excessive Recordkeeping Fees.**

145.    Plaintiff Biera was a participant in the Plan during the Relevant Period and personally paid excessive recordkeeping and administrative fees. These fees were not tethered to the actual cost of services provided but instead varied with asset size. Importantly, the fee calculations set forth below already account for revenue credits received, so they reflect Plaintiff Biera's net costs.

146.    The Plan's contractual recordkeeping fee declined throughout the class period: nine (9) basis points in 2019, 6.8 basis points in 2020, 6.3 basis points in 2021, and 4.5 basis points beginning in 2022. This decline demonstrates that Fidelity was capable of providing the exact same services for 4.5 basis points all along. At minimum, Defendants should have enforced that lower rate throughout the class period. Instead, Plaintiff Biera and other participants paid inflated fees for years before the contractual rate finally reached the level Fidelity was already capable of delivering.

147.    The following chart summarizes Plaintiff Biera's actual recordkeeping and administrative fees by quarter and year, alongside: (i) what a reasonable pro rata fee would have been based on market benchmarks, (ii) the contractual Fidelity fee in effect at the time, and (iii) Fidelity's current stated fee of 4.5 basis points. This chart demonstrates that Plaintiff Biera consistently paid more than what a prudent fiduciary would have negotiated, and often more than the contractual rate itself.

-37-
FIRST AMENDED CLASS ACTION COMPLAINT

148.  **Chart No. 7** – Plaintiff Biera's Actual Fees Compared to Reasonable and Contractual Fees (Net of Revenue Credits)

| Quarter | Quarterly | | Actual Paid by Plaintiff | Reasonable Fee $40/part Prorated | Contractual Fidelity RK & Admin Fee Rate | Current Fidelity Fee 4.5bp |
|---|---|---|---|---|---|---|
| 2016 Q1 | 0.16 | 2016 | **10.77** | **11.41** | **14.67** | **7.34** |
| 2016 Q2 | 5.58 | *Difference* | | *-0.65* | *-3.91* | *3.43* |
| 2016 Q3 | 0.88 | | | | | |
| 2016 Q4 | 4.15 | | | | | |
| 2017 Q1 | 7.53 | 2017 | **22.29** | **13.28** | **20.60** | **10.30** |
| 2017 Q2 | 5.13 | *Difference* | | *9.01* | *1.69* | *11.99* |
| 2017 Q3 | 8.78 | | | | | |
| 2017 Q4 | 0.85 | | | | | |
| 2018 Q1 | 6.54 | 2018 | **27.56** | **19.94** | **29.91** | **14.95** |
| 2018 Q2 | 5.41 | *Difference* | | *7.63* | *-2.34* | *12.61* |
| 2018 Q3 | 12.54 | | | | | |
| 2018 Q4 | 3.07 | | | | | |
| 2019 Q1 | *(0.03)* | 2019 | **26.17** | **14.29** | **26.78** | **13.39** |
| 2019 Q2 | 6.23 | *Difference* | | *11.88* | *-0.62* | *12.78* |
| 2019 Q3 | 8.34 | | | | | |
| 2019 Q4 | 11.63 | | | | | |
| 2020 Q1 | 5.68 | 2020 | **5.68** | **3.12** | **5.14** | **3.42** |
| | | *Difference* | | *2.56* | *0.54* | *2.26* |
| | | | | | | |
| *Total Net Fee Paid by Biera* | *92.47* | *Total* | | *27.88* | *-5.18* | *40.80* |

[1]Ending Balance Per Account Statement
[2] 408(b)(2) Disclosures (Annual Administrative Services Revenue)
[3] Plan begins utilizing direct fees, no fee shown in the second quarter of 2023
[4] Contractual fees: (2016 - 2019 - 0.09%, 2020 - 0.0675, 2021 - 0.0625, 2022 - 2025 - 0.045%)
[5] The reasonable $40 pro-rata fee is based on the calculations in Chart 1 of the Proposed FAC, row for Reasonable Asset Based RK/Admin Fee

149.  For example, in 2017 Plaintiff Biera paid $22.29 in recordkeeping fees. A reasonable pro rata fee for 2017 would have been only $13.28, the Plan's contractual rate translated to $20.60, and the same services could have been provided

-38-

FIRST AMENDED CLASS ACTION COMPLAINT

at 4.5 basis points for $10.30. Plaintiff Biera therefore overpaid by $9.01 above the reasonable fee, $1.69 above the contractual rate, and $11.99 above the fee Fidelity itself later adopted.

150.   In 2018, she paid $27.56 compared to $19.94 under a reasonable fee, $29.91 under the contractual rate, and $14.95 at 4.5 bps. In 2019, she paid $26.17 compared to $14.29 under a reasonable fee, $26.78 under the contractual rate, and $13.39 at 4.5 bps. In 2020, she paid $5.68 compared to $3.12 under a reasonable fee, $5.14 under the contractual rate, and $3.42 at 4.5 bps.

151.   As shown in Chart No. 7, Plaintiff Biera's cumulative overpayments during the Relevant Period total:

$27.88 more than a reasonable pro rata fee;

$40.80 more than Fidelity's current 4.5 basis point fee.

152.   Plaintiff Biera's injuries are concrete and particularized. She personally paid more than what a reasonable fiduciary would have negotiated, directly reducing her account balance and the compounding growth of her retirement savings. Even though she received some revenue credits, those credits did not cure her injury. Money was first withdrawn from her account, depriving her of the opportunity for those dollars to remain invested and compound. Any later credits merely offset part of the harm after the fact; they did not restore the lost investment growth or eliminate Defendants' imprudent fee practices. Plaintiff Biera therefore has Article III standing to pursue the claims asserted herein.

## VI. Plaintiff Biera Lost Compounded Returns Due to Defendants' Imprudent Selection of Higher-Cost Share Classes

153.   Plaintiff Biera was invested in multiple Plan funds during the Relevant Period that carried excessive costs because Defendants selected and retained higher-cost retail share classes instead of materially identical lower-cost institutional share

-39-
FIRST AMENDED CLASS ACTION COMPLAINT

classes. These included, among others, the Fidelity Low-Priced Stock Fund, Janus Henderson Triton Fund, iShares MSCI EAFE International Fund, MFS Growth Fund, T. Rowe Price Equity Index 500 Fund, JPMorgan US Small Company Fund, JPMorgan Research Enhanced Equity Fund, Fidelity Balanced Fund, and T. Rowe Price Retirement 2025 Fund. The underlying investments, managers, and strategies were identical across share classes; the only difference was cost.

154.   For example, the Fidelity Low-Priced Stock Fund charged an expense ratio of 0.89% in its retail share class, compared to only 0.50% in the institutional K6 class. Similarly, the MFS Growth R4 share class charged 0.58% compared to 0.49% in the materially identical R6 class, the Fidelity Balanced Fund charged 0.47% compared to 0.32% in its K6 class, and the T. Rowe Price Retirement 2025 Fund charged 0.55% compared to 0.39% in its institutional I class. These differentials—ranging from 9 to 39 basis points annually—were pure waste, providing no additional benefit to participants.

155.   Plaintiff Biera personally bore these higher expenses through reduced net returns in her account. The higher-cost share classes caused her investments to underperform year after year. Over the course of her participation in the Plan, these losses compounded, eroding her retirement savings. Even though Plaintiff Biera received revenue credits, those credits did not cure her injury. Money was first withdrawn from her account, depriving her of the opportunity for those funds to remain invested and compound. Any later credits merely offset part of the harm after the fact; they did not restore the lost investment growth or eliminate the structural imprudence of Defendants' fee practices.

156.   Just as with recordkeeping fees, Defendants could have eliminated these losses entirely by selecting the lower-cost institutional share classes. At minimum, a prudent fiduciary would have monitored the Plan's investments and moved participants into the lower-cost classes once they were available.

FIRST AMENDED CLASS ACTION COMPLAINT

157.   Plaintiff Biera's losses from Defendants' share-class decisions are concrete and particularized. She suffered diminished returns that reduced her account balance and foregone compounded growth during her years in the Plan. These harms are actual and ongoing, not hypothetical, and they establish Article III standing for Plaintiff Biera to challenge Defendants' imprudent share-class selections.

**D.    Defendants Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care, Which Lagged in Benchmark Comparisons, and for which they Selected Expensive Share Classes When Cheaper and Better Performing Funds Were Available**

158.   Plan fiduciaries have a continuing duty to monitor investments and remove imprudent ones.

159.   When considering fund performance, Plan fiduciaries must consider several relevant performance benchmarks.

160.   In this regard, mutual fund portfolio managers choose a benchmark index to use in their prospectus as a comparison for evaluating fund performance often referred to as the Primary Prospectus Benchmark ("PBM").

161.   However, in addition to the PBM selected by the fund managers themselves, third parties may provide more appropriate comparators for each fund than the fund-selected comparator.

162.   Morningstar, Inc. ("Morningstar") is one such third party and a respected financial services company that provides research and analytics that are used throughout the asset management industry.

163.   In 1996, Morningstar created category classifications to help investors make meaningful comparisons between mutual funds.

164.   "Morningstar found that the investment objective listed in a fund's prospectus often did not adequately explain how the fund actually invested" and Morningstar "solved this problem by breaking portfolios into peer groups based on

FIRST AMENDED CLASS ACTION COMPLAINT

their holdings" which "help investors identify the top performing funds, assess potential risk, and build well-diversified portfolios."4

165.   Per Morningstar,

[t]he driving principles behind the classification system are as follows:

- Individual portfolios within a category invest in similar types of securities and therefore share the same risk factors (for example, style risk, prepayment risk).
- Individual portfolios within a category can, in general, be expected to behave more similarly to one another than to portfolios outside the category.
- The aggregate performance of different categories differs materially over time.
- Categories have enough constituents to form the basis for reasonable peer group comparisons.
- The distinctions between categories are meaningful to investors and assist in their pursuit of investing goals.[5]

166.   Critically, Morningstar determined that funds may select broad-based market comparators as their primary benchmark and that the funds may reflect a "low degree of correlation" with the corresponding benchmark.[6]

167.   In order to provide a better measure of fund performance, Morningstar publishes data on each fund's performance compared to Morningstar selected benchmarks.

168.   First, the Morningstar Category Index ("MCI") is a category specific index that allows investors and advisors to compare fund performance to benchmarks that may be a better fit to the true makeup of a fund than the fund-selected PBM.

---

4 http://morningstardirect.morningstar.com/clientcomm/morningstar_categories_us_april_2016.pdf
5 *Id.*
6 https://www.morningstar.com/articles/372237/understanding-best-fit-versus-standard-indexes

169.   MCIs are commonly used as comparators in investment selection, monitoring and reporting tools used by investment managers and 401(k) investment committees. MCI comparisons can be beneficial because they typically represent the weighted returns of the vast majority of investments within a specific asset-class (i.e. large-cap growth or small-cap value) which allows those selecting and monitoring investments to better identify risk and return derivations between the mutual funds they are reviewing.

170.   Second, Morningstar selects a Best-Fit Index ("BFI") for each fund based on the composition of the fund over the prior 36-month period.[7]  Because the fund is highly correlated to its BFI, comparison of a fund to its BFI makes it is easier to determine how much of a fund's movements are based on the movements of the index, the relative level of risk a portfolio manager is taking, and ultimately whether a portfolio manager is adding value.

171.   The MCI and BFI are strong comparators and useful tools for evaluating fund performance because portfolio managers of funds with the same investment purpose make buy and sell decisions based on the same pool of investments (stocks and/or bonds). These benchmarks help investors determine whether a specific portfolio manager has skill determining what assets to hold within that pool and how much to over/underweight certain investments and when to buy and sell.

172.   When evaluating fund performance, a prudent fiduciary considers data on a fund's performance against all relevant benchmarks including its MCI and BFI when evaluating fund performance because those comparators evaluate whether the fund is performing well based on the actual purpose and design of the fund.

173.   As discussed below, Defendants maintained funds that underperformed their relevant benchmarks and offered expensive share classes when lower fee and better performing funds were available.

---

[7] *Id.*

-43-

FIRST AMENDED CLASS ACTION COMPLAINT

174.   T. Rowe Price Equity Index 500

175.   Defendants have imprudently maintained the Plan's investment in the T. Rowe Price Equity Index 500 fund despite its poor performance and high fees.

176.   As discussed above, Defendants imprudently selected an expensive share class for this fund when identical, cheaper share classes were available.

177.   Additionally, it is not prudent to continue to maintain the fund in the Plan because it has been substantially outperformed by its PBM and BFI, the S&P 500 TR USD.

**T Rowe Price Equity Index 500**

178.   Defendants have imprudently maintained the Plan's investment in the T Rowe Price Equity Index 500 fund despite its poor performance and high fees.

179.   As discussed above, Defendants imprudently maintained expensive share classes for this fund when identical, cheaper share classes were available.

180.   Additionally, it is not prudent to continue to maintain the fund in the Plan because it has been outperformed by its PBM and the Best Fit Index.

**Chart No. 8**

| T. Rowe Price Equity Index 500 vs MCI, BFI and PBM (1/1/2017 - 12/31/2022) | | | |
|---|---|---|---|
| Investment | +/- MCI | +/- BFI | +/- PBM |
| | | | |
| T. Rowe Price Equity Index 500 | 0.53 | (2.23) | (2.23) |
| Difference vs MCI | $188,270.24 | | |
| Difference vs BFI | | ($792,998.10) | |
| Difference vs PBM | | | ($792,998.10) |

181.   Although the fund slightly outperformed its MCI, the fund vastly underperformed its PBM, which is also its BFI.

182.   This underperformance and the imprudence of maintaining American T. Rowe Price Equity Index 500 fund during the class period is also evidenced by the

-44-

fact that the fund underperformed its relevant benchmark comparators for the ten years prior to its selection in 2014 and in the time period since selection.

**Chart No. 9**

| Fund Name | +/- PBM Prior to Selection[1] | +/- PBM since Selection[2] | +/- BFI Prior to Selection[1] | +/- BFI since Selection[2] | +/- MCI Prior to Selection[1] | +/- MCI since Selection[2] |
|---|---|---|---|---|---|---|
| T. Rowe Price Equity Index 500 (2014) | (5.16) | (4.70) | (5.16) | (4.70) | (12.47) | 0.73 |

1. Represents the funds' +/- return relative to the benchmark ten year prior to the year the fund was selected
2. Represents the funds' +/- return relative to the benchmark since the year fund was selected through the end of 2022

183.    Further, Defendants could have selected for the Plan the same investment vehicle with lower fees, the Fidelity 500 Index fund.  Both of the funds are designed to track the S&P 500.  As demonstrated below, Defendants' failure to select this lower fee index fund has cost the Plan in excess of $738,341.

184.    In fact, the comparator fund was in the Plan until 2014 as the Spartan 500 Index fund.  Notably, it was reinstated back into the Plan in 2023.  Defendants cost the plan by replacing it with the higher fee T. Rowe Price fund only to replace it with the clear and better option all along.**Chart No. 10**

| Investments | Prospectus Benchmark (PBM) | Prospectus Net Expense Ratio | 1/1/17 - 12/31/22 | | | |
|---|---|---|---|---|---|---|
| | | | BOY 2017 Assets | Return (Cumulative) | +/- PBM | Difference During Period ($) |
| T. Rowe Price Equity Index 500 | S&P 500 TR USD | 0.15 | 35,588,828 | 88.91 | -2.23 | |
| Fidelity® 500 Index | S&P 500 TR USD | 0.02 | | 90.98 | -0.15 | |
| *Cost of High Fee Fund* | | (0.14) | | (2.07) | | (738,341) |

**MFS Growth R4**

185.    Defendants have imprudently maintained the Plan's investment in the MFS Growth R4 fund despite its poor performance and high fees.

186.    As discussed above, Defendants imprudently maintained expensive share classes for this fund when identical, cheaper share classes were available.

-45-

FIRST AMENDED CLASS ACTION COMPLAINT

187.   Additionally, it is not prudent to continue to maintain the fund in the Plan because it has been substantially outperformed by its PBM, the Russell 1000 Growth TR USD, which is also its MCI.

**Chart No. 11**

| MFS Growth R4 vs MCI, BFI and PBM (1/1/2017 - 12/31/2022) | | | |
|---|---|---|---|
| Investment | +/- MCI | +/- BFI | +/- PBM |
| MFS Growth R4 | -45.50 | -2.65 | -45.50 |
| Difference vs MCI | ($12,545,197.56) | | |
| Difference vs BFI | | ($730,638.26) | |
| Difference vs PBM | | | ($12,545,197.56) |

188.   The fund significantly underperformed its PBM, which is also its MCI.

189.   This underperformance and the imprudence of maintaining the MFS Growth R4 fund during the class period is also evidenced by the fact that the fund massively underperformed its PBM and MCI in the eleven-year period since it was selected, including during the class period, through 2024.

**Chart No. 12**

| Fund Name | +/- PBM since Selection[1] | +/- BFI since Selection[1] | +/- MCI since Selection[1] |
|---|---|---|---|
| MFS Growth R4 (2012) | -46.33 | -7.66 | -46.33 |

190.   Further, Defendants could have selected for the Plan a substantially identical investment with lower fees, the TIAA-CREF Large-Cap Gr Idx Instl fund (now called the Nuveen Large Cap Growth Index R6 hereinafter "Nuveen").

-46-
FIRST AMENDED CLASS ACTION COMPLAINT

191.   The Nuveen fund is an appropriate comparator to the MFS Growth fund because they share a PBM and are both "Large Growth" investments used by investors for identical investment purposes.

192.   Both funds hold widely-known large cap companies within their top 20 holdings including Alphabet (Google), Apple, Microsoft, Amazon, NVIDIA, Broadcom, Netflix, UnitedHealth Group, Visa, and others (based on an analysis performed through Morningstar on September 15, 2025).

193.   They both use the Russell 1000 Growth TR USD as their primary prospectus benchmark and both track it closely with the Nuveen fund having an r-squared score of 100 as it is designed to track this benchmark and the MFS Growth fund having a score of 96.94 compared to the benchmark during the period from January 1, 2017 through December 31, 2022. [8]

194.   As demonstrated below, Defendants' failure to select this lower fee, better performing index fund has cost the Plan in excess of $12 million.

**Chart No. 13**

| Investments | Prospectus Benchmark (PBM) | Prospectus Net Expense Ratio | 1/1/17 - 12/31/24 | | | |
|---|---|---|---|---|---|---|
| | | | BOY 2017 Assets | Return (Cumulative) | +/- PBM | Difference During SOL Period ($) |
| MFS Growth R4 | Russell 1000 Growth TR USD | 0.58 | 27,571,255 | 271.24 | -45.50 | |
| Nuveen Large Cap Growth Index R6 | Russell 1000 Growth TR USD | 0.05 | | 314.77 | -1.98 | |
| *Cost of Active Management* | | (0.53) | | (43.53) | | (12,001,767) |

---

[8] R-squared values are used to calculate correlation between a fund and an index with scores ranging from 0 to 100.  A score approaching 100 indicates that a fund's performance is highly correlated with the index it tracks.

-47-

FIRST AMENDED CLASS ACTION COMPLAINT

**JPMorgan US Small Company L**

195. Defendants imprudently maintained the Plan's investment in the JPMorgan US Small Company L fund through 2019 despite its poor performance and high fees.

196. Defendants imprudently maintained an expensive share class for this fund when identical, cheaper share classes were available.

197. Additionally, it was not prudent to maintain the fund in the Plan when it was being substantially outperformed by its PBM and MCI, the Russell 2000 TR USD, and by its BFI, the Morningstar US Sml Ext TR USD.

**Chart No. 14**

| JPMorgan US Small Company L vs MCI, BFI and PBM (1/1/2017 - 12/31/2019) | | | |
|---|---|---|---|
| Investment | +/- MCI | +/- BFI | +/- PBM |
| | | | |
| JPMorgan US Small Company L | (7.08) | (10.38) | (7.08) |
| Difference vs MCI | ($3,948,672.49) | | |
| Difference vs BFI | | ($3,713,116.76) | |
| Difference vs PBM | | | ($3,948,672.49) |

198. This underperformance and the imprudence of selecting and maintaining the JPMorgan US Small Company L fund during the class period is also evidenced by the fact that the fund massively underperformed its BFI in the ten years prior to selection (while barely outperforming its MCI and PBM during that period), and underperformed its PBM, MCI, and BFM in the six year period after it was selected until it was finally removed at or around the end of 2019.

//

//

//

//

-48-

FIRST AMENDED CLASS ACTION COMPLAINT

**Chart No. 15**

| Fund Name | +/- PBM Prior to Selection[1] | +/- PBM since Selection[2] | +/- BFI Prior to Selection[1] | +/- BFI since Selection[2] | +/- MCI Prior to Selection[1] | +/- MCI since Selection[2] |
|---|---|---|---|---|---|---|
| JPMorgan US Small Company L (2014 - 2019) | 0.95 | (7.08) | (16.83) | (6.11) | 0.95 | (7.08) |

1. Represents the funds' +/- return relative to the benchmark ten year prior to the year the fund was selected
2. Represents the funds' +/- return relative to the benchmark since the year fund was selected through the end of 2019

199.   Further, Defendants could have selected for the Plan a substantially identical investment with lower fees, the iShares Russell 2000 Small-Cap Idx K fund.

200.   The iShares Russell 2000 Small-Cap Idx K fund is an appropriate comparator to the MFS Growth fund because they share a PBM and are both "Small Blend" investments used by investors for identical investment purposes.

201.   Both funds have similar holdings by sector as shown in the table below (based on an analysis performed using Morningstar data on June 1, 2023).

**Chart No. 16**

| | JPMorgan US Small Company L (Investment %) | iShares Russell 2000 Small-Cap Idx K (Investment %) |
|---|---|---|
| Basic Materials | 4.28 | 4.26 |
| Consumer Cyclical | 11.31 | 10.35 |
| Financial Services | 14.55 | 15.99 |
| Real Estate | 6.35 | 7.72 |
| Communication Services | 2.22 | 2.58 |
| Energy | 5.44 | 6.71 |
| Industrials | 14.68 | 14.83 |
| Technology | 16.05 | 13.62 |
| Consumer Defensive | 5.50 | 4.25 |

-49-
FIRST AMENDED CLASS ACTION COMPLAINT

| | JPMorgan US Small Company L (Investment %) | iShares Russell 2000 Small-Cap Idx K (Investment %) |
|---|---|---|
| Healthcare | 16.63 | 16.21 |
| Utilities | 2.99 | 3.49 |

202.    They both use the Russell 2000 TR USD as their primary prospectus benchmark and both track it closely with the iShares fund having a score of 100 as it is designed to track this benchmark and the JPMorgan fund having an r-squared score of 97.98 compared to the benchmark during the period from January 1, 2017 through December 31, 2019 (when the JP Morgan fund was removed from the Plan).

203.    In fact, Defendants ultimately did replace the JPMorgan US Small Company L fund with the iShares Russell 2000 Small-Cap Idx K, confirming that they are functionally equivalent for purposes of the Plan.

204.    As demonstrated below, Defendants' failure to select this lower fee, better performing index fund cost the Plan in excess of $4 million.

**Chart No. 17**

| Investments | Prospectus Benchmark (PBM) | Prospectus Net Expense Ratio | 1/1/17 - 12/31/19 | | | |
|---|---|---|---|---|---|---|
| | | | BOY 2017 Assets | Return (Cumulative) | +/- PBM | Difference During Period ($) |
| JPMorgan US Small Company L (ly 2019) | Russell 2000 TR USD | 0.81 | 35,786,235 | 17.03 | -11.03 | |
| iShares Russell 2000 Small-Cap Idx K (IS 2020) | Russell 2000 TR USD | 0.07 | | 28.32 | 0.26 | |
| **Cost of High Fee Fund** | | (0.74) | | (11.29) | | (4,040,067) |

**Janus Henderson Triton I**

205.    Defendants imprudently maintained the Plan's investment in the Janus Henderson Triton I fund through 2021 despite its poor performance and high fees.

206.    Defendants imprudently maintained an expensive share class for this fund when identical, cheaper share classes were available. Additionally, it was not

-50-

FIRST AMENDED CLASS ACTION COMPLAINT

prudent to maintain the fund in the Plan when it was being substantially outperformed by its PBM, the Russell 2500 Growth TR USD.

**Chart No. 18**

| Janus Henderson Triton I vs MCI, BFI and PBM (1/1/2017 - 12/31/2021) | |
| --- | --- |
| Investment | +/- PBM |
| | |
| Janus Henderson Triton I | (12.21) |
| *Difference vs PBM* | ($2,991,515.01) |

207. Defendants could have selected for the Plan a substantially identical investment with lower fees, the Vanguard Explorer Adm fund.

208. The Vanguard Explorer Adm fund is an appropriate comparator to the Janus Henderson Triton fund because they share a PBM and are both "Small Growth" investments used by investors for identical investment purposes.

209. Both funds invest largely in small and medium-sized companies and they both use the Russell 2500 Growth TR USD as their primary prospectus benchmark. They both track the benchmark closely with the Vanguard Explorer Adm fund having an r-squared score of 96.48 compared to the benchmark and the Janus Henderson Triton fund having a score of 96.038 compared to the benchmark during the period from January 1, 2017 through December 31, 2021.

210. The Vanguard Explorer Adm fund was in the Plan until 2011, when it was replaced with the Janus Henderson Triton fund, despite its poor performance in comparison. Defendants ultimately did replace the Janus Henderson Triton fund again with the Vanguard Explorer Adm fund in 2022, confirming that they are equivalent investments for purposes of the Plan.

211. As demonstrated below, Defendants' failure to select this lower fee, better performing fund cost the Plan nearly $7 million.

-51-
FIRST AMENDED CLASS ACTION COMPLAINT

**Chart No. 19**

| Investments | Prospectus Benchmark (PBM) | Prospectus Net Expense Ratio | 1/1/17 - 12/31/21 | | | |
|---|---|---|---|---|---|---|
| | | | BOY 2017 Assets | Return (Cumulative) | +/- PBM | Difference During Period ($) |
| Janus Henderson Triton I (ly 2021) | Russell 2500 Growth TR USD | 0.76 | 24,494,101 | 113.20 | -12.21 | |
| Vanguard Explorer Adm (2022) | Russell 2500 Growth TR USD | 0.34 | | 141.60 | 16.18 | |
| *Cost of High Fee Fund* | | (0.42) | | (28.39) | | (6,954,701) |

## PGIM Quant Solutions Small-Cap Val Z

212.  Defendants have imprudently maintained the Plan's investment in the PGIM Quant Solutions Small-Cap Val Z fund despite its poor performance and high fees.

213.  Defendants imprudently maintained an expensive share class for this fund when an identical, cheaper share class was available.

214.  Additionally, it was not prudent to maintain the fund in the Plan until 2019 because it was substantially outperformed by its PBM and MCI, the Russell 2000 Value TR USD, as well as its BFI, the Morningstar US Sml Brd Val Ext TR USD.

**Chart No. 20**

| PGIM Quant Solutions Small-Cap Val Z vs MCI, BFI and PBM (1/1/2017 - 12/31/2019) | | | |
|---|---|---|---|
| Investment | +/- MCI | +/- BFI | +/- PBM |
| PGIM Quant Solutions Small-Cap Val Z | (12.32) | (11.39) | (12.32) |
| *Difference vs MCI* | ($478,463.60) | | |
| *Difference vs BFI* | | ($442,651.55) | |
| *Difference vs PBM* | | | ($478,463.60) |

-52-

FIRST AMENDED CLASS ACTION COMPLAINT

215. This underperformance and the imprudence of maintaining the PGIM Quant Solutions Small-Cap Val fund during the class period is also evidenced by the fact that even though it performed well prior to selection, the fund underperformed its PBM and MCI in the eleven-year period since it was selected, including during the class period, through 2022.

**Chart No. 21**

| Fund Name | +/- PBM Prior to Selection[1] | +/- PBM since Selection[2] | +/- BFI Prior to Selection[1] | +/- BFI since Selection[2] | +/- MCI Prior to Selection[1] | +/- MCI since Selection[2] |
|---|---|---|---|---|---|---|
| PGIM Quant Solutions Small-Cap Val Z (2015-2019) | 47.28 | (12.34) | (.07) | (6.45) | 47.28 | (12.34) |

1. Represents the funds' +/- return relative to the benchmark ten year prior to the year the fund was selected
2. Represents the funds' +/- return relative to the benchmark since the year fund was selected through the end of 2022

216. Further, Defendants could have selected for the Plan a substantially identical investment with lower fees, the Vanguard Russell 2000 Value Index I fund.

217. The Vanguard Russell 2000 Value Index I fund is an appropriate comparator to the PGIM Quant Solutions Small-Cap Val fund because they share a PBM and are both "Small Value" investments used by investors for identical investment purposes, the investment in small-cap value stocks in the United States.

218. Both funds track the benchmark closely with the Vanguard Russell 2000 Value Index I fund having a score of 100 as it is designed to track this benchmark and the PGIM Quant Solutions Small-Cap Val fund having an r-squared score of 96.68 compared to the benchmark during the period from January 1, 2017 through December 31, 2019 (when the PGIM fund was removed from the Plan)

219. Both funds have similar holdings by sector as shown in the table below (based on an analysis performed using Morningstar data on June 1, 2023).

//

-53-
FIRST AMENDED CLASS ACTION COMPLAINT

**Chart No. 22**

|  | PGIM Quant Solutions Small-Cap Val Z (Investment %) | Vanguard Russell 2000 Value Index I (Investment %) |
|---|---|---|
| Basic Materials | 5.53 | 3.78 |
| Consumer Cyclical | 10.83 | 11.97 |
| Financial Services | 26.47 | 23.21 |
| Real Estate | 15.32 | 13.22 |
| Communication Services | 3.6 | 2.83 |
| Energy | 7.2 | 5.96 |
| Industrials | 12.26 | 12.97 |
| Technology | 5.6 | 7.0 |
| Consumer Defensive | 4.65 | 3.85 |
| Healthcare | 7.28 | 10.17 |
| Utilities | 1.27 | 5.04 |

220.   As demonstrated below, Defendants' failure to select this lower fee, better performing index fund cost the Plan nearly $500,000.

**Chart No. 23**

| Investments | Prospectus Benchmark (PBM) | Prospectus Net Expense Ratio | 1/1/17 - 12/31/19 | | | Difference During Period ($) |
|---|---|---|---|---|---|---|
| | | | BOY 2017 Assets | Return (Cumulative) | +/- PBM | |
| PGIM Quant Solutions Small-Cap Val Z | Russell 2000 Value TR USD | 0.79 | 3,884,773 | 2.69 | -12.32 | |
| Vanguard Russell 2000 Value Index I | Russell 2000 Value TR USD | 0.08 | | 15.13 | 0.13 | |
| *Cost of Active Management* | | (0.71) | | (12.44) | | (483,381) |

221.   Defendants were aware of or should have been aware of the

222.   performance discussed above and had a duty to actively cull expensive underperforming funds whose continued inclusion in the Plan could not be justified and which were costing Plan participants excess fees that were not justified by performance.

-54-

FIRST AMENDED CLASS ACTION COMPLAINT

223.    During the Class Period, Defendants failed to consider and monitor materially similar but cheaper alternatives to the Plan's investment options discussed above.  This failure is a further indication that Defendants lacked a prudent investment monitoring process and breached their fiduciary duties to the Plan.

224.    Defendants have a continuing duty to evaluate the Plan funds and remove underperforming funds.

225.    Defendants were or should have been aware of the continuous underperformance of the funds enumerated in the charts and discussed above and removed the funds from the Plan.

226.    Defendants' failure to remove these funds from the Plan reflects either that Defendants failed to put in place a prudent investment monitoring process or failed to engage in that process.

227.    Accordingly, Defendants breached their fiduciary duties by failing to remove the funds resulting in financial losses to the Plan and its participants.

## CLASS ACTION ALLEGATIONS

228.    Plaintiff brings this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

229.    All participants in or beneficiaries of the CORELOGIC, INC. 401(K) PLAN from six years prior to the filing of the complaint in this matter through the date of judgment (the "Class Period" or "Relevant Time Period").

**Sub-Class A** (T. Rowe Price Equity Index 500)
All participants in or beneficiaries of the CORELOGIC, INC. 401(K) PLAN who, at any time during the Class Period through the time the Fund was removed from the Plan, were invested in the T. Rowe Price Equity Index 500 Fund.

**Sub-Class B** (MFS Growth R4)

All participants in or beneficiaries of the CORELOGIC, INC. 401(K) PLAN who, at any time during the Class Period, were invested in the MFS Growth R4 Fund.

**Sub-Class C** (JPMorgan US Small Company L)

All participants in or beneficiaries of the CORELOGIC, INC. 401(K) PLAN who, at any time during the Class Period through the time the Fund was removed from the Plan, were invested in the JPMorgan US Small Company L Fund.

**Sub-Class D** (Janus Henderson Triton I)

All participants in or beneficiaries of the CORELOGIC, INC. 401(K) PLAN who, at any time during the Class Period through the time the Fund was removed from the Plan, were invested in the Janus Henderson Triton I Fund.

**Sub-Class E** (PGIM Quant Solutions Small-Cap Value Z)

All participants in or beneficiaries of the CORELOGIC, INC. 401(K) PLAN who, at any time during the Class Period through the time the Fund was removed from the Plan, were invested in the PGIM Quant Solutions Small-Cap Value Z Fund.

230.   The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Plan has approximately 6,978 participants with account balances.

231.   Questions of law and fact common to the members of the Class predominate over questions that may affect individual class members, including, inter alia:

(a)  whether Defendants are fiduciaries of the Plan;

(b)  whether Defendants breached their fiduciary duty of prudence with respect to the Plan;

(c)  whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d)  whether Defendants breached their duty to monitor other fiduciaries of the Plan; and

(e)  the extent of damage sustained by Class members and the appropriate measure of damages.

232.   Plaintiff's claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

233.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

234.   Plaintiff has no interests that conflict with those of the Class. Defendant does not have any unique defenses against Plaintiff that would interfere with their representation of the Class.

235.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

//

-57-

FIRST AMENDED CLASS ACTION COMPLAINT

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Prudence

### (Against All Defendants)

236.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

237.   Defendants were fiduciaries of the Plan under ERISA §§ 3(21) and/or 402(a)(1), 29 U.S.C. §§ 1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

238.   As a fiduciary of the Plan, Defendants were required, pursuant to ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

239.   Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. See 29 C.F.R. § 2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." Tibble, 135 S. Ct. at 1828.

-58-

FIRST AMENDED CLASS ACTION COMPLAINT

240.   As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high cost and poor performance relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

241.   In addition, Defendants failed to monitor or control excessive compensation paid for recordkeeping services which resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

242.   In addition, Defendants failed to monitor or control excessive compensation paid for shareholder or financial advising services which resulted from the unnecessary payment of those services as a percentage of assets.

243.   Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

244.   As a direct and proximate result of these breaches, the Plan, Plaintiff and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiff or any member of the Class, pursuant to ERISA §§ 502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§ 1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers**

**(Against All Defendants)**

245.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

246.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

247.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

248.   Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which

-60-

FIRST AMENDED CLASS ACTION COMPLAINT

they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

249.   Defendants breached their fiduciary monitoring duties by, among other things:

250.   (a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for substantially identical investment products readily available elsewhere, as detailed herein; (b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiff and members of the Class; and (c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain expensive and poorly performing investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings; (d) failing to institute competitive bidding for service providers.

251.   As a direct and proximate result of these breaches of the duty to monitor the Plan, Plaintiff and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

252.   Pursuant to ERISA § 502(a)(2) and (a)(3), and ERISA § 409(a), 29 U.S.C. § 1132(a)(2) and (a)(3), and 29 U.S.C. § 1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

-61-
FIRST AMENDED CLASS ACTION COMPLAINT

## THIRD CAUSE OF ACTION

### Prohibited Transactions

### (Against All Defendants)

253.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

254.   As a service provider to the Plan, Fidelity is a party in interest. 29 U.S.C. §1002(14)(B).

255.   By causing the Plans to use Fidelity as a recordkeeper from year to year, Defendants caused the Plans to engage in transactions that Defendants knew or should have known constituted a direct or indirect furnishing of services between the Plan and Fidelity prohibited by 29 U.S.C. §1106(a)(1)(C). These transactions occurred each time the Plan paid fees to Fidelity.

256.   Total losses to the Plan will be determined after complete discovery in this case and are continuing.

257.   Under 29 U.S.C. §1109(a), Defendants are liable to restore all losses to the Plan resulting from these prohibited transactions, and to provide restitution of all proceeds from these prohibited transactions, and are subject to other appropriate equitable or remedial relief.

258.   Each Defendant knowingly participated in these transactions, enabled the other Defendants to cause the Plans to engage in these transactions, and knew of these transactions and failed to make any reasonable effort under the circumstances to remedy or discontinue the transaction. Thus, under 29 U.S.C. §1105(a), each Defendant is liable for restoring all proceeds and losses attributable to these transactions.

### PRAYER FOR RELIEF

Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully requests the Court:

FIRST AMENDED CLASS ACTION COMPLAINT

- Certify the Class, appoint Plaintiff as class representative, and appoint Christina Humphrey Law, P.C. and Bradley/Grombacher, LLP as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of their fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of their fiduciary duties;
- Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under § 1109(a);
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Award monetary damages;
- Injunctive Relief in the form of fee leveling or some more equitable distribution of administrative fees;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;
- Order equitable restitution against Defendants;
- Award to Plaintiff and the Class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;
- Order the payment of interest to the extent it is allowed by law; and

-63-

FIRST AMENDED CLASS ACTION COMPLAINT

- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: December 18, 2025

**CHRISTINA HUMPHREY LAW, P.C.
BRADLEY/GROMBACHER, LLP**


By:    */s/ Christina A. Humphrey*
       CHRISTINA A. HUMPHREY
       MARCUS J. BRADLEY
       KILEY L. GROMBACHER

       *Attorneys for Plaintiffs
       and the Putative Class*

-64-
FIRST AMENDED CLASS ACTION COMPLAINT