CATALINA VERGARA (Bar No. 223775)
cvergara@omm.com
STUART SARNOFF (*pro hac vice*)
ssarnoff@omm.com
ALEXANDER REED (*pro hac vice*)
areed@omm.com
CRAIG MCALLISTER (*pro hac vice*)
cmcallister@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407

Attorneys for Defendants CORELOGIC, INC. and
THE RETIREMENT PLAN COMMITTEE OF
CORELOGIC, INC. 401(K) SAVINGS PLAN

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINIDAD BIERA, ELIZABETH FIKSE, and DANNY SABANA, individually and as representatives of a Putative Class of Participants and Beneficiaries, on behalf of all similarly situated participants and beneficiaries on behalf of the CORELOGIC, INC. 401(K) SAVINGS PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>CORELOGIC, INC., THE RETIREMENT PLAN COMMITTEE OF CORELOGIC, INC. 401(K) SAVINGS PLAN, and DOES 1 through 10,<br><br>Defendants. | Case No. 8:23-cv-00965-HDV-JDE<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COUNTS I AND II OF THE FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:  April 30, 2026<br>Time:  10:00 am<br>Place:  Courtroom 5B<br>Judge:  Hon. Hernan D. Vera<br><br>Amended Complaint Filed:  Dec. 18, 2025<br>Trial Date:  TBD |

-1-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on April 30, 2026 at 10:00 am, or as soon thereafter as this matter may be heard before the Honorable Hernan D. Vera, in Courtroom 5B of the above-titled Court, located at 351 West First Street, Los Angeles, California 90012, defendants CoreLogic, Inc. ("CoreLogic")[1] and the Retirement Plan Committee of CoreLogic, Inc. 401(k) Savings Plan ("Committee") will and hereby do move the Court to dismiss with prejudice the First and Second Causes of Action alleged in the First Amended Complaint ("Amended Complaint" or "AC") (Dkt. No. 84) filed by plaintiffs Trinidad Biera, Elizabeth Fikse, and Danny Sabana.

Plaintiffs bring three putative class claims under the Employee Retirement Income Security Act of 1974 ("ERISA"). In the First Cause of Action ("Count I"), plaintiffs allege that defendants breached their fiduciary duty of prudence under 29 U.S.C. § 1104(a)(1), *first*, by allegedly causing the Plan to pay excessive fees for third-party recordkeeping services (AC ¶¶ 40–78), including by offering Plan participants allegedly "higher-cost" share classes of funds that make revenue sharing payments, offsetting the Plan's direct recordkeeping expenses (*id.* ¶¶ 79–118); and *second*, by selecting and retaining certain investment options that allegedly underperformed others available in the market (*id.* ¶¶ 158–227). *See generally id.* ¶¶ 236–44 (First Cause of Action). In the Second Cause of Action ("Count II"), plaintiffs allege that defendants breached their fiduciary duty to monitor the fiduciaries that allegedly committed the foregoing breaches. *Id.* ¶¶ 245–52 (Second Cause of Action). Plaintiffs also allege, in the Third Cause of Action ("Count III"), that defendants caused the Plan to engage in transactions prohibited by 29 U.S.C. § 1106(a)(1)(C) by paying fees for services to the Plan's recordkeeper, a party-in-interest. AC ¶¶ 253–58.

---

[1] In March 2025, CoreLogic rebranded as Cotality, and the CoreLogic 401(k) Savings Plan (the "Plan") that is the subject of this lawsuit was renamed the Cotality 401(k) Savings Plan. For clarity, this motion and supporting memorandum refer to "CoreLogic" and the "Plan."

As explained in greater detail in the accompanying Memorandum of Points and Authorities, the Amended Complaint fails to state a viable claim that defendants breached any fiduciary duties, and the defects in plaintiffs' pleading cannot be cured by further amendment.  In addition, plaintiff Fikse's claims are time-barred.  Defendants thus respectfully request that the Court dismiss Counts I and II with prejudice, and dismiss plaintiff Fikse from the action.

Defendants' Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities, and Declaration of Alexander Reed in Support of Defendants' Motion to Dismiss Counts I and II of the First Amended Complaint ("Reed Declaration"); the pleadings in this action; and such other materials and evidence as may be presented to the Court.  The Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place by videoconference on January 22, 2026.

Dated:  January 29, 2026

CATALINA VERGARA
O'MELVENY & MYERS LLP


By:      */s/ Catalina Vergara*
          Catalina Vergara

Attorneys for Defendants
CORELOGIC, INC. and THE RETIREMENT PLAN COMMITTEE OF CORELOGIC, INC. 401(K) SAVINGS PLAN

-2-
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

**MEET AND CONFER CERTIFICATION**

Pursuant to L.R. 7-3 and the Court's Standing Order 6(a)(ii), I, Catalina Vergara, certify that the parties' counsel met by videoconference on January 22, 2026, thoroughly discussed each and every issue raised in the Motion, and attempted in good faith to resolve the Motion in whole or in part.

Dated:  January 29, 2026

CATALINA VERGARA
O'MELVENY & MYERS LLP


By:      */s/ Catalina Vergara*
          Catalina Vergara

Attorneys for Defendants
CORELOGIC, INC. and THE RETIREMENT
PLAN COMMITTEE OF CORELOGIC, INC.
401(K) SAVINGS PLAN

-1-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

# **TABLE OF CONTENTS**

Page

I.      INTRODUCTION ............................................................................................ 1

II.     FACTUAL BACKGROUND ........................................................................... 3

    A.    The CoreLogic Plan ............................................................................ 3

    B.    The Plan's Investment Options ........................................................... 3

    C.    The Plan's Service Providers .............................................................. 4

    D.    Plaintiffs' Participation in the Plan .................................................... 4

    E.    Procedural History and Plaintiffs' Claims ......................................... 5

III.    LEGAL STANDARD ..................................................................................... 6

IV.     ARGUMENT .................................................................................................. 7

    A.    Plaintiff Fikse's Claims Are Time-Barred .......................................... 7

    B.    Plaintiffs Fail To State A Claim For Breach Of The Duty Of Prudence ................ 8

        1.    Plaintiffs' Share Class/Recordkeeping Theory Does Not Permit an Inference of Imprudence ............... 10

        2.    Plaintiffs' Alternative Fund Theory Likewise Does Not Permit an Inference of Imprudence ............... 14

    C.    Plaintiffs' Derivative Monitoring Claim Fails As a Matter of Law ...................... 18

    D.    Plaintiffs' Fiduciary Breach Claims Should be Dismissed With Prejudice ........... 19

V.      CONCLUSION ............................................................................................. 19

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Anderson v. Intel Corp. Inv. Pol'y Comm.*,
137 F.4th 1015 (9th Cir. 2025) .................................................................. 8, 15

*Ascon Properties, Inc. v. Mobil Oil Co.*,
866 F.2d 1149 (9th Cir. 1989) ........................................................................ 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................ 6

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) ............................................................................. 8

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................ 6

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ........................................................... 7

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014) ............................................................................................ 8

*Cunningham v. Cornell University*,
604 U.S. 693 (2025) ........................................................................................ 1

*Dalton v. Freeman*,
2025 WL 3771345 (E.D. Cal. Dec. 31, 2025) ................................................ 1

*Davis v. Salesforce.com, Inc.*,
2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) .................................................. 15

*Davis v. Salesforce.com, Inc.*,
2022 WL 1055557 (9th Cir. Apr. 8, 2022) ..................................................... 16

*Davis v. Wash. Univ. in St. Louis*,
960 F.3d 478 (8th Cir. 2020) ......................................................................... 16

*Divane v. Nw. Univ.*,
953 F.3d 980 (7th Cir. 2020) ......................................................................... 16

*Donovan v. Mazzola*,
716 F. 2d 1226 (9th Cir. 1983) ................................................................... 8, 15

*Dorman v. Charles Schwab Corp.*,
2018 WL 6803738 (N.D. Cal. Sept. 20, 2018) ......................................... 18, 19

*Dorman v. Charles Schwab Corp.*,
2019 WL 580785 (N.D. Cal. Feb. 8, 2019) ................................................... 17

*Dupree v. Prudential Ins. Co. of Am.*,
2007 WL 2263892 (S.D. Fla. Aug. 7, 2007) .................................................. 16

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ..................................................................................... 7, 8

-i-

*Guyes v. Nestle USA, Inc.*,
  2022 WL 18106384 (E.D. Wis. Nov. 21, 2022) ...................................................................... 13

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009)................................................................................ 11, 16

*Howard v. Shay*,
  100 F.3d 1484 (9th Cir. 1996)................................................................................... 9

*Hughes v. Northwestern Univ.*,
  142 S. Ct. 737 (2022) ......................................................................................... 8, 17

*Hunter v. Caliber Sys., Inc.*,
  220 F.3d 702 (6th Cir. 2000).................................................................................... 8

*In re Calpine Corp.*,
  2005 WL 1431506 (N.D. Cal. Mar. 31, 2005)........................................................... 19

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)................................................................................... 6

*In re Unisys Sav. Plan Litig.*,
  74 F.3d 420 (3d Cir. 1996)........................................................................................ 8

*Jenkins v. Yager*,
  444 F.3d 916 (7th Cir. 2006)................................................................................... 18

*Kendall v. Pharm. Prod. Dev., LLC*,
  2021 WL 1231415 (E.D.N.C. Mar. 31, 2021) ........................................................... 9

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)................................................................................... 7

*Kong v. Trader Joe's Co.*,
  2022 WL 1125667 (9th Cir. Apr. 15, 2022) ........................................................... 12

*Lauderdale v. NFP Ret., Inc.*,
  2021 WL 3828646 (C.D. Cal. Aug. 18, 2021)......................................................... 11

*Lauderdale v. NFP Ret., Inc.*,
  2022 WL 422831 (C.D. Cal. Feb. 8, 2022)............................................................. 11

*Leimkuehler v. Am. United Life Ins. Co.*,
  713 F.3d 905 (7th Cir. 2013)................................................................................... 11

*Loomis v. Exelon Corp.*,
  658 F.3d 667 (7th Cir. 2011)................................................................................... 11

*Marks v. Trader Joe's Co.*,
  2020 WL 2504333 (C.D. Cal. Apr. 24, 2020) .................................................... 10, 18

*Marshall v. Northrop Grumman Corp.*,
  2018 WL 1406703 (C.D. Cal. Feb. 15, 2018)......................................................... 19

*Matney v. Barrick Gold of N. Am.*,
  80 F.4th 1136 (10th Cir. 2023) ....................................................................... 12, 17

-ii-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

*Mator v. Wesco Distrib., Inc.*,
  2022 WL 3566108 (W.D. Pa. Aug. 18, 2022) ........................................................................ 13

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ........................................................................ 12

*McWashington v. Nordstrom, Inc.*,
  2025 WL 1736765 (W.D. Wash. June 23, 2025)........................................................................ 7

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018)........................................................................ 16

*Miller v. Packaging Corp. of Am.*,
  2023 WL 2705818 (W.D. Mich. Mar. 30, 2023) ........................................................................ 13

*Mills v. Molina Healthcare, Inc.*,
  2022 WL 17825534 (C.D. Cal. Dec. 8, 2022) ........................................................................ 8, 10, 12

*Munoz v. Ashcroft*,
  339 F.3d 950 (9th Cir. 2003)........................................................................ 8

*Partida v. Schenker Inc.*,
  2024 WL 1354432 (N.D. Cal. Mar. 29, 2024)........................................................................ 7

*Patterson v. Cap. Grp. Cos.*,
  2018 WL 748104 (C.D. Cal. Jan. 23, 2018) ........................................................................ 16

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ........................................................................ 16, 18

*Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013)........................................................................ 8

*Phillips v. Cobham Advanced Elec. Sols., Inc.*,
  2025 WL 2689268 (N.D. Cal. Sept. 19, 2025) ........................................................................ 15, 16

*Probst v. Eli Lilly & Co.*,
  2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ........................................................................ 13

*Reetz v. Aon Hewitt Inv. Consulting, Inc.*,
  74 F.4th 171 (4th Cir. 2023) ........................................................................ 17

*Romero v. Nokia, Inc.*,
  2013 WL 5692324 (N.D. Cal. Oct. 15, 2013)........................................................................ 10

*Roth v. Sawyer-Cleator Lumber Co.*,
  16 F.3d 915 (8th Cir. 1994)........................................................................ 8

*Sabana v. CoreLogic, Inc.*,
  2024 WL 755723 (C.D. Cal. Jan. 26, 2024) ........................................................................ 5, 10

*Sabana v. CoreLogic, Inc.*,
  2025 WL 985111 (9th Cir. Apr. 2, 2025) ........................................................................ 5

*Sievert v. Knight-Swift Transp. Holdings, Inc.*,
  780 F. Supp. 3d 870 (D. Ariz. 2025)........................................................................ 7, 18

-iii-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

*Sigetich v. Kroger Co.*,
2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ........................................................................ 13

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024)..................................................................................................... 14

*Singh v. Deloitte LLP*,
650 F. Supp. 3d 259 (S.D.N.Y. 2023)....................................................................................... 13

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ................................................................................................. 17

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001)...................................................................................................... 6

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .................................................................................................................... 6

*Terraza v. Safeway Inc.*,
241 F. Supp. 3d 1057 (N.D. Cal. 2017) ................................................................................. 10

*Tibble v. Edison Int'l*,
729 F.3d 1110 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015).................... 17

*Tobias v. NVIDIA Corp.*,
2021 WL 4148706 (N.D. Cal. Sept. 13, 2021) ............................................................. 7, 11, 13

*Turner v. City & Cty. of S.F.*,
788 F.3d 1206 (9th Cir. 2015)..................................................................................................... 6

*Wehner v. Genentech*,
2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ...................................................... 12, 14, 15, 16

*White v. Chevron Corp.*,
2017 WL 2352137 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018) ............................................................................................................................ 11, 12, 17

*White v. Chevron*,
2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)................................................................. passim

*Wildman v. Am. Century Servs., LLC*,
362 F. Supp. 3d 685 (W.D. Mo. 2019) ................................................................................... 18

*Wright v. Oregon Metallurgical Corp.*,
360 F.3d 1090 (9th Cir. 2004)..................................................................................................... 8

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
325 F. App'x 31 (2d Cir. 2009) .......................................................................................... 12, 14

*Zimmerman v. Cedars-Sinai Med. Ctr.*,
2024 WL 1135773 (C.D. Cal. Feb. 18, 2024)........................................................................... 7

**Statutes**

29 U.S.C. § 1104(a)(1)...................................................................................................................... 9

29 U.S.C. § 1104(a)(1)(B) ........................................................................................................... 6, 7

29 U.S.C. § 1106(a)(1)(C) ............................................................................................................... 6

-iv-

29 U.S.C. § 1108(b)(2) ................................................................................................ 1

29 U.S.C. § 1113(1) .................................................................................................... 7

**Rules**

Fed. R. Evid. 201(b)(2) ............................................................................................... 7

**Regulations**

17 C.F.R. § 230.482(b)(3)(i) ...................................................................................... 18

29 C.F.R. § 2550.404a-5(d)(1)(ii)(A) ...................................................................... 18

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      INTRODUCTION**

CoreLogic is a data analytics and financial services company that offers its employees the opportunity to participate in a 401(k) plan to save for retirement.  Eligible employees may defer a portion of their annual compensation to their Plan accounts, and CoreLogic makes discretionary matching contributions—in the millions of dollars annually—to support employees' retirement planning.  The CoreLogic Committee that administers the Plan has engaged experienced and reputable providers to serve as the Plan's recordkeeper/trustee (Fidelity) and investment advisor (NFP Retirement).  Leveraging the services of those providers, the Plan offered participants over two dozen investment options during the relevant period, covering a diverse mix of investment styles, strategies, and risk profiles—thus enabling participants of all types to save for retirement in a way that was consistent with their unique circumstances, goals, and investment preferences.

It is against this backdrop that plaintiffs claim defendants breached their fiduciary duties under ERISA.  Employing the most threadbare allegations, plaintiffs claim that defendants (i) imprudently failed to obtain reasonable fees for third-party recordkeeping services, including by investing in share classes of certain mutual funds that make revenue sharing payments to the Plan's recordkeeper (and thus appear to be more expensive than alternative share classes that don't make such payments) (the "Share Class/Recordkeeping Theory"); and (ii) imprudently retained five Plan investment options despite the availability of allegedly better-performing, lower-cost alternatives (the "Alternative Fund Theory").  Neither of these two theories, as alleged, supports a plausible claim of fiduciary breach.[2]

---

[2] Plaintiffs also bring a prohibited transactions claim in Count III.  Defendants do not move for dismissal of that claim, in light of the Supreme Court's decision in *Cunningham v. Cornell University*, 604 U.S. 693 (2025).  Defendants will instead answer the claim and plead the exemptions codified under ERISA § 408(b)(2) as affirmative defenses.  *See* 29 U.S.C. § 1108(b)(2) (exempting "reasonable arrangements with a party in interest" for "necessary" services in exchange for "reasonable compensation").  Defendants will also move to compel plaintiffs to reply to defendants' answer under Rule 7(a)(7).  *See Cunningham*, 604 U.S. at 708 (2025); *see also Dalton v. Freeman*, 2025 WL 3771345, at *2 (E.D. Cal. Dec. 31, 2025) (granting motion to order plaintiffs to file Rule 7 reply to answer addressing § 1108 affirmative defense, based on *Cunningham*).  To the extent defendants are required to respond to Count III here, defendants deny the claim and request that the Court dismiss it.

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

To state a viable claim for breach of fiduciary duty, plaintiffs must advance plausible allegations that defendants failed to employ a prudent decision-making process. But to the extent the Amended Complaint addresses the Plan's process at all, it paints that process in a *favorable* light, including by acknowledging that the Plan retained a third-party expert investment adviser to guide its decisions and made changes to the investment options in the Plan lineup over time. Plaintiffs ask this Court to infer an imprudent process anyway, based solely on their labeling of certain investment options as unsuitable and certain service provider fees as unreasonable, yet they offer nothing more than implausible inferences:

- *First*, the mere inclusion of allegedly higher-cost funds in the Plan does not suggest a breach of fiduciary duty, particularly where, as here, the practice of revenue sharing provides an obvious alternative explanation for those higher costs—one that ultimately accrues to participants' benefit. Nor do plaintiffs' allegations plausibly suggest that those investments resulted in excessive payments to Fidelity relative to the services Fidelity actually rendered. If anything, the survey on which plaintiffs rely establishes that the reasonableness of recordkeeping fees varies from plan to plan, with no requirement under ERISA that fiduciaries endeavor to secure the lowest possible fee.

- *Second*, plaintiffs' theory that five Plan funds should have been replaced by allegedly superior alternatives is premised on faulty, hindsight-based comparisons of funds on different ends of the risk-reward spectrum. Plaintiffs ignore that courts have repeatedly endorsed fiduciary decisions to allow participants the choice to invest in actively-managed funds, and their claims inescapably conflict with ERISA's process-focused prudence standard and basic economic theory cautioning *against* chasing a fund's past returns.

At bottom, the Amended Complaint reduces to a contention that *no* prudent fiduciary could have conceivably offered the same funds or the same fee structure as the Committee here, if they had followed any kind of reasonable process. Plaintiffs' allegations do not come close to plausibly supporting such an extraordinary claim. On the contrary, the Amended Complaint and incorporated materials establish that the Plan's investment offerings and fee arrangements were

-2-

well within the mainstream of ERISA plan practices.

For these reasons, and as explained in greater detail below, the Court should dismiss Counts I and II of the Amended Complaint with prejudice.  In addition, the Court should dismiss plaintiff Fikse from the action altogether, as her claims are time-barred.

## II.   FACTUAL BACKGROUND

### A.   The CoreLogic Plan

CoreLogic sponsors the Plan, a defined contribution plan under 29 U.S.C. § 1002(2)(A) and § 1002(34) in which participants maintain individual accounts that are funded through salary deferrals and company matching contributions.  AC ¶¶ 4, 17; *see, e.g.*, Ex. H at 30 (describing company match policy).  The Plan is governed by a written plan document, which appoints CoreLogic as the Plan administrator and named fiduciary.  AC ¶¶ 17, 37.  CoreLogic has delegated Plan administrative responsibility—including the responsibility for selecting and monitoring the Plan's investment options and service providers—to the Committee.  *Id.* ¶ 18.

During the relevant period, between 6,214 and 7,652 employees participated in the Plan. *Id.* ¶ 59.  As of year-end 2024, the Plan held around $767 million in assets, with average participant holdings exceeding $123,000—representing 69% growth in the Plan's assets (around $453 million) and 118% growth in the average participant's holdings (around $57,000) since 2016.  *See id.*

### B.   The Plan's Investment Options

The Plan offered participants over two dozen investment options over the relevant time period.  *Id.* ¶ 90.  The Committee made certain changes to the lineup over the years, *see, e.g.*, *id.* ¶¶ 89, 184, 203, 210, but at all times the available options covered a broad range of asset classes, risk profiles, and investment strategies, including both actively-managed and passive funds, *see generally* Exs. A–J.  The Plan's investment options also varied in cost, with some expense ratios as low as a few basis points (for passive index funds), some comparatively higher-priced actively-managed funds, and many falling between those poles.  *See, e.g.*, Exs. I–J at 0000744–745, 0000989 (fund expense ratios as of Q2 2017 and Q4 2024).  As plaintiffs acknowledge, many of the Plan's funds paid revenue sharing to third parties, meaning a portion of their expense ratios

-3-

were used to offset Plan administrative costs.  AC ¶¶ 46, 69–70, 90; *see, e.g.*, Exs. I–J at 0000744–745, 0000989 (showing "Investment Option Fees Attributable to Recordkeeping"); Ex. D at 0000357–364 (describing "Indirect Compensation" amounts paid by certain Plan funds to Fidelity as a percentage of assets).

### C.    The Plan's Service Providers

The Plan received services from multiple providers during the relevant period, including NFP, an independent investment consultant who advised the Committee on Plan investment options, and Fidelity, who served as the Plan's recordkeeper and trustee.  AC ¶¶ 22–23, 89. Fidelity's core recordkeeping services included, among other things, government reporting; sponsor support; transaction processing; participant communications; and plan document, compliance and support testing, and Form 5500 services.  *Id.* ¶¶ 61, 65.  Fidelity also provided à la carte services upon request, including but not limited to participant loan processing, brokerage services, and distribution services.  *Id.* ¶¶ 66–67.  Through Fidelity's online platform, Plan participants could manage their individual accounts by, for example, adjusting their contribution levels and allocating funds to the investments of their choosing.  *See id.* ¶¶ 65, 67.

### D.    Plaintiffs' Participation in the Plan

Plaintiff Sabana is a CoreLogic employee who has participated in the Plan since Q2 2019, investing exclusively in a target-date fund tied to his expected retirement year.  *Id.* ¶ 13. Plaintiffs Fikse and Biera are former CoreLogic employees who participated in the Plan until Q2 2019 and Q4 2020, respectively, investing in a variety of funds.  *Id.* ¶¶ 14–15.  Plaintiffs paid recordkeeping and administrative fees through revenue sharing—meaning portions of their investment expenses were paid out by the fund managers to Fidelity to cover those recordkeeping expenses—and they each received periodic "revenue credits" that had the effect of increasing their account balances and offsetting those fees.  Reed Decl. ¶ 16 (summarizing plaintiffs' account statements).  Biera's and Fikse's recordkeeping and administrative fees were paid exclusively through revenue sharing, while Sabana began paying minimal out-of-pocket fees starting in Q3 2023.  *Id.*; *see* Exs. K–M.  Accounting for direct fees, revenue sharing, and revenue credits, plaintiffs allege that Sabana paid less than $72 over six years (or $12 annually) and Biera

-4-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

paid less than $93 over four-plus years (or $22 annually), AC ¶¶ 122, 148—well below the $40 annual fee they allege would have been a reasonable per-participant fee across the Plan as a whole, *id.* ¶ 50.

### E.       Procedural History and Plaintiffs' Claims

Plaintiff Sabana filed this putative class action in June 2023, asserting two causes of action for breach of fiduciary duty in connection with the Plan's investments and recordkeeping fees.  Dkt. No. 1.  Defendants moved to dismiss the complaint with prejudice and the Court granted the motion, finding Sabana lacked Article III standing to pursue his claims and that the Court therefore lacked subject matter jurisdiction over the action.  *Sabana v. CoreLogic, Inc.*, 2024 WL 755723, at *3–6 (C.D. Cal. Jan. 26, 2024) ("*Sabana I*").[3]  Sabana appealed, and the United States Court of Appeals for the Ninth Circuit reversed this Court's order, holding that the dismissal should have been "without prejudice."  *Sabana v. CoreLogic, Inc.*, 2025 WL 985111, at *2 (9th Cir. Apr. 2, 2025) ("*Sabana II*").  The Ninth Circuit remanded with instruction to permit Sabana an opportunity to amend, after which this Court could evaluate "whether or not he still lacks standing."  *Id*.  It did not find that Sabana necessarily had standing to pursue any of this claims, but rather opined that a particular fee theory of standing in connection with Sabana's recordkeeping claim—which he articulated for the first time on appeal—was not "futile on its face," such that he should have an opportunity to amend.  *Id.* at *1.[4]  Defendants thereafter provided Sabana with numerous documents to facilitate an amended pleading, with the mutual goal of avoiding serial amendments.  *See* Dkt. No. 79-1 at 4.

Sabana and two new plaintiffs now assert three causes of action in their Amended Complaint, purportedly on behalf of all Plan participants and their beneficiaries since June 2,

---

[3] Finding no subject matter jurisdiction, the Court did not address defendants' separate argument that the complaint failed to state a claim upon which relief can be granted under Rule 12(b)(6).

[4] Sabana's appeal did not challenge, and the Ninth Circuit therefore did not reverse, this Court's conclusion that he lacked Article III standing to pursue claims regarding the performance of funds in which he did not invest.  Brief for Plaintiff-Appellant, *Sabana v. CoreLogic, Inc.*, No. 24-987 (9th Cir. May 3, 2024), Dkt. No. 8.2 at 18.

2017.[5] *First*, plaintiffs claim that defendants breached their fiduciary duty of prudence under ERISA, 29 U.S.C. § 1104(a)(1)(B), by: (i) failing to offer, monitor, and investigate the availability of lower-cost share classes for fourteen funds and one target-date suite (*id.* ¶¶ 79–118), which resulted in allegedly higher-cost share classes overcompensating the Plan's recordkeeper, Fidelity (*id.* ¶¶ 40–78); and (ii) selecting and retaining five investment options despite the availability of allegedly higher-performing alternatives in the market (*id.* ¶¶ 158–227). *Second*, plaintiffs claim that defendants breached their fiduciary duty to monitor the fiduciaries that committed the underlying breaches. *Id.* ¶¶ 245–52. Plaintiffs allege that the foregoing breaches caused Plan participants "substantial losses" in the "millions of dollars," *id.* ¶¶ 118, 244, 251, and request various forms of equitable relief, including monetary compensation, *id.* at 62–64. *Third*, plaintiffs claim that defendants caused the Plan to engage in prohibited transactions, 29 U.S.C. § 1106(a)(1)(C), by paying Fidelity for its services, though plaintiffs identify no purported losses. AC ¶¶ 253–58.

## III.    LEGAL STANDARD[6]

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Turner v. City & Cnty. of S.F.*, 788 F.3d 1206, 1210 (9th Cir. 2015). While the Court must accept well-pleaded facts as true, it need not accept allegations that are "merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), or that are "contradict[ed] [by] matters properly subject to judicial notice" or incorporation, *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)

---

[5] Plaintiffs also propose five sub-classes, each consisting of Plan participants who invested in any of the five funds challenged under the Alternative Fund Theory. AC ¶ 229.

[6] Unless otherwise indicated, all emphasis in the cited authority in this brief is added and all internal citations and quotations are omitted.

-6-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

(courts "*must* consider" documents the complaint incorporates by reference or that are subject to judicial notice).  A document must be deemed incorporated by reference if a complaint "refers extensively to the document" of if the document otherwise "forms the basis of the plaintiff's claim," *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018), and it is subject to "judicial notice" if it contains facts "not subject to reasonable dispute" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b)(2).[7]

To state a claim for breach of ERISA's fiduciary duty of prudence, a complaint must plausibly allege that the fiduciary did not act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  29 U.S.C. § 1104(a)(1)(B).  Motions to dismiss are "important mechanism[s] for weeding out meritless claims" in ERISA cases.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## IV.   ARGUMENT

### A.   Plaintiff Fikse's Claims Are Time-Barred

As alleged, plaintiff Fikse closed her Plan account in Q1 2019, shortly after she separated from CoreLogic.  AC ¶ 15.  She first asserted her claims in September 2025, when plaintiffs moved for leave to file an amended complaint.  Dkt. No. 79.  Her claims are thus time-barred under ERISA's six-year statute of repose, 29 U.S.C. § 1113(1), which is not "subject to equitable

---

[7] Exhibits A–N to the Reed Declaration are each properly before the Court under the "incorporation" doctrine.  The Amended Complaint expressly relies on (i) the Plan's publicly available Form 5500 filings (AC ¶¶ 37, 39), (ii) the Plan's 408(b)(2) disclosures (*id.* ¶ 38), (iii) plaintiffs' account statements (*id.* ¶¶ 122, 135, 148), and (iv) the 2023 Defined Contribution Plan & Fee Survey ("NEPC Report") (*id.* ¶¶ 50).  Courts "routinely" consider these types of documents on motions to dismiss (including in ERISA cases) where, as here, the complaint expressly incorporates them.  *Tobias v. NVIDIA Corp.*, 2021 WL 4148706, at *5 (N.D. Cal. Sept. 13, 2021); *see, e.g.*, *Partida v. Schenker Inc.*, 2024 WL 1354432, at *6 n.4 (N.D. Cal. Mar. 29, 2024) (plan fee disclosure); *Zimmerman v. Cedars-Sinai Med. Ctr.*, 2024 WL 1135773, at *4 (C.D. Cal. Feb. 18, 2024) (plaintiff account statements); *McWashington v. Nordstrom, Inc.*, 2025 WL 1736765, at *2 (W.D. Wash. June 23, 2025) (Form 5500s); *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1108 n.37 (C.D. Cal. 2012) (third-party report).  The publicly available Form 5500 filings with the DOL are additionally subject to judicial notice.  *See Sievert v. Knight-Swift Transp. Holdings, Inc.*, 780 F. Supp. 3d 870, 875 (D. Ariz. 2025).

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

tolling" based on plaintiff Sabana's filing of the original complaint in June 2023. *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014); *see Munoz v. Ashcroft*, 339 F.3d 950, 957 (9th Cir. 2003) ("Statutes of repose are not subject to equitable tolling."). For that reason, Plaintiff Fikse must be dismissed from this action.

### B.   Plaintiffs Fail To State A Claim For Breach Of The Duty Of Prudence

Counts I and II of the Amended Complaint should be dismissed because plaintiffs have failed to state a fiduciary breach claim upon which relief may be granted. ERISA is concerned with process, not results. As the Ninth Circuit has repeatedly explained, a fiduciary's actions must be evaluated "prospectively, based on the methods the fiduciaries employed, rather than retrospectively, based on the results they achieved." *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 137 F.4th 1015, 1021 (9th Cir. 2025); *accord Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1097 (9th Cir. 2004); *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983).[8] Indeed, as the Supreme Court has cautioned, "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022) (citing *Dudenhoeffer*, 573 U.S. at 425). Plaintiffs must accordingly allege "specific deficiencies" in defendants' process to state a viable imprudence claim, or "facts from which the Court can plausibly infer such deficiencies." *Mills v. Molina Healthcare, Inc.*, 2022 WL 17825534, at *11–12 (C.D. Cal. Dec. 8, 2022).

Plaintiffs have alleged *no* specific deficiencies in defendants' decision-making process related to the selection and/or retention of the Plan's investment options and recordkeeper. To the

---

[8] Other circuits are in accord. *See, e.g.*, *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44–45 (1st Cir. 2018) (the prudence standard is "one of <u>conduct</u>, and not a test of the result of performance of the investment" (emphasis in original)); *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (the prudence "standard 'focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)); *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 722 (6th Cir. 2000) (similar); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994) ("[T]he prudent person standard is not concerned with results").

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

contrary, the Amended Complaint and the documents it incorporates demonstrate that the Plan's fiduciaries took steps to optimize the Plan for its participant base.  Among other things, the fiduciaries retained an independent investment consultant to support their investment selection and monitoring process, provided participants with a mix of actively- and passively-managed investment options—covering a wide range of asset classes, risk profiles, and expense ratios— periodically made adjustments to the Plan's investment menu as appropriate, and employed a cost-efficient recordkeeping fee structure that ultimately put money back in participants' pockets. *See* AC ¶¶ 89–90, 98, 198, 202, 218; Reed Decl. ¶ 10 & Exs. A–H (reflecting *negative* $2.3 million in direct compensation paid to Fidelity between 2017 and 2024).  These are all hallmarks of a prudent fiduciary process.  *See, e.g.*, *White v. Chevron*, 2016 WL 4502808, at *10–11 (N.D. Cal. Aug. 29, 2016) ("*White I*") (dismissing prudence claims where "[t]he breadth of investments and range of fees the Plan offered participants fits well within the spectrum that other courts have held to be reasonable as a matter of law," and where funds engaged in revenue sharing that "inure[d] to the benefit" of participants); *Kendall v. Pharm. Prod. Dev., LLC*, 2021 WL 1231415, at *7 (E.D.N.C. Mar. 31, 2021) (dismissing prudence claims and citing as "informative" defendants' retention of investment advisor); *see also Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996) (explaining that "securing an independent assessment from a financial advisor . . . is evidence of a thorough investigation").

Lacking any specific deficiencies to impugn the fiduciary process here, plaintiffs urge an inference of imprudence simply from the choices made by the Committee concerning the Plan's investments and service arrangement with Fidelity—the logic being that the choices were so obviously defective that they could not have resulted from any prudent process.[9]  In the end,

---

[9] Plaintiffs vaguely allege that defendants' allegedly imprudent decisions also amounted to a breach of their duty of loyalty.  AC ¶¶ 6, 244.  The basis for these stray disloyalty allegations is difficult to discern.  Plaintiffs allege no facts suggesting defendants failed to prioritize the interests of Plan participants, *see* 29 U.S.C. § 1104(a)(1), fail to raise even a potential conflict of interest, and make no distinction between any alleged disloyal or imprudent conduct.  *See* AC ¶¶ 236–44 (describing first cause of action for breach of the fiduciary duty of prudence only).  Courts routinely dismiss disloyalty claims where, as here, they simply piggyback on other theories of fiduciary breach.  *See, e.g.*, *White I*, 2016 WL 4502808, at *5 (dismissing loyalty claim "[b]ecause the complaint does not differentiate between breach of the duty of prudence and

-9-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

however, neither plaintiffs' Share Class/Recordkeeping Theory nor their Alternative Fund Theory plausibly supports an inference that defendants acted imprudently.

### 1.   Plaintiffs' Share Class/Recordkeeping Theory Does Not Permit an Inference of Imprudence

Plaintiffs' first theory posits that the Plan's inclusion of revenue-sharing mutual fund share classes in lieu of "readily available" lower-cost versions was imprudent (AC ¶ 87), and that Fidelity was overcompensated for providing recordkeeping services to the Plan (*see id.* ¶¶ 52–53, 93). This Court previously recognized that those allegations are merely "different sides of the same coin," and must be considered together. *Sabana I*, 2024 WL 755723, at *4. That is because, as plaintiffs acknowledge, the Plan's supposedly "higher-cost" share classes included revenue sharing, the proceeds of which were used to offset Plan recordkeeping and administrative fees and therefore accrued to participants' benefit. *See* AC ¶¶ 46, 69–70, 99. Plaintiffs' real gripe, therefore, is not with *how* the fiduciaries opted to pay the recordkeeper (since plaintiffs understand that revenue sharing can equalize apparent differences in expense ratios), but *how much*. And for good reason, as courts have repeatedly endorsed revenue sharing as a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1081 n.8 (N.D. Cal. 2017).

In any case, plaintiffs' allegations do not support an inference that defendants breached any fiduciary duties with respect to their selection of particular fund share classes or with respect to participants' overall fee burden.

*First*, "the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class is not enough, standing alone, to state a claim for breach of the duty of prudence." *Mills*, 2022 WL 17825534, at *11. "Ample authority holds that merely alleging that a plan offered retail rather than institutional share classes is insufficient to carry a claim for fiduciary breach." *Marks v. Trader Joe's Co.*, 2020 WL 2504333, at *7 (C.D. Cal. Apr. 24,

---

breach of the duty of loyalty, and includes no separate allegations to support the duty of loyalty claim"); *Romero v. Nokia, Inc.*, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (dismissing "claim for breach of the duty of loyalty" that did not "present any separate allegations regarding any loyalty breach"). This Court should do the same.

-10-

2020).[10]  Indeed, given the "myriad distinctions between financial products," there are "numerous reasons why a fiduciary may choose to include one investment vehicle instead of another." *Lauderdale v. NFP Ret., Inc.*, 2022 WL 422831, at *17 (C.D. Cal. Feb. 8, 2022).  Any imprudence claim in this case therefore must necessarily account for the benefits of revenue sharing that plaintiffs themselves acknowledge.[11]

Accounting for the benefits of revenue sharing here, there are no plausible allegations of fiduciary breach.  As a general matter, "the higher a given share class's expense ratio, the more the fund pays [the service provider] in revenue sharing," and "the more [the service provider] receives in revenue sharing, the less it charges plan sponsors or participants directly for its services." *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 909 (7th Cir. 2013).  That's exactly what happened here.  The Plan's Form 5500 filings—on which plaintiffs' allegations are based (AC ¶ 39), *supra* n.7—show that, from 2017 to 2024, the Plan disclosed total direct compensation paid to Fidelity of *negative* $2.3 million.  Reed Decl. ¶ 10 & Exs. A–H.  In other words, the Plan's payment of indirect compensation—*i.e.*, revenue sharing—more than compensated Fidelity for services during this period, with the Plan ultimately receiving rebates each year between 2018 and 2024 (paying recordkeeping costs out of pocket in 2017 only).  *Id.* Revenue sharing thus provides an "obvious alternative explanation" for the Plan's inclusion of non-lowest-cost share classes: "those share classes paid the Plan's recordkeeping expenses."

---

[10] *See, e.g.*, *Tobias*, 2021 WL 4148706, at *11 (rejecting allegation that failure to utilize lower cost share classes of mutual funds created inference of imprudence, because revenue sharing provided alternative explanation for share class decision); *Lauderdale v. NFP Ret., Inc.*, 2021 WL 3828646, at *8 (C.D. Cal. Aug. 18, 2021) (rejecting argument that availability of lower-cost shares, without more, plausibly alleges imprudence); *White v. Chevron Corp.*, 2017 WL 2352137, at *11 (N.D. Cal. May 31, 2017) ("*White II*") ("[C]ourts have dismissed claims that fiduciaries are required to offer institutional over retail-class funds"), *aff'd*, 752 F. App'x 453 (9th Cir. 2018); *White I*, 2016 WL 4502808, at *14 (dismissing prudence claim concerning revenue-sharing arrangement, because "conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable" is "without support").

[11] Courts have also observed that retail share classes may also offer other benefits besides revenue sharing, including increased transparency, more opportunities to benchmark, and increased liquidity over their institutional class counterparts. *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (discussing advantages of retail class funds over institutional class funds); *Loomis v. Exelon Corp.*, 658 F.3d 667, 670–72 (7th Cir. 2011) (same).

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

*White II*, 2017 WL 2352137, at *14.[12]

*Second*, plaintiffs fare no better with their conclusory allegations that the revenue sharing payments retained by Fidelity resulted in "excessive" compensation for its recordkeeping services. AC ¶¶ 40–78. To survive dismissal, plaintiffs "must allege facts from which one could infer that the same services were available for less on the market." *Wehner v. Genentech*, 2021 WL 507599, at *5 (N.D. Cal. Feb. 9, 2021); *see Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.) (requiring plaintiffs to allege fees were excessive relative to the "services rendered," such that they "could not have been the product of arm's-length bargaining). Here, plaintiffs acknowledge that Fidelity provided government reporting, plan sponsor support, recordkeeping, and plan investment services (AC ¶ 61), and that the Plan likely received additional services for its revenue-sharing compensation, including loan processing, brokerage, and distribution services, and processing of qualified domestic relations orders (*id.* ¶ 66). Plaintiffs plead no facts to suggest that the mutual fund revenue Fidelity received as compensation resulted in excessive fees for these specific Plan services.

To be sure, plaintiffs aver that Fidelity did not provide any "unique services" to the Plan (*id.* ¶ 62) and that its services "did not materially change" from year-to-year (*id.* ¶ 56). These do not raise a plausible inference that the fees in question were excessive "in relation to" the "*specific* services" Fidelity provided to this "*specific* plan." *Wehner*, 2021 WL 507599, at *5 (emphasis in original); *see also Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1157 (10th Cir. 2023) ("[T]he relevant comparative data point in this context is the services offered for the price charged."); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279–80 (8th Cir. 2022) ("[T]he

---

[12] Defendants acknowledge that in *Kong v. Trader Joe's Co.*, 2022 WL 1125667 (9th Cir. Apr. 15, 2022) ("*Kong II*"), the Ninth Circuit reversed a district court order dismissing fiduciary breach allegations where a revenue sharing agreement submitted at the dismissal stage "show[ed] only what could occur in theory—not what occurred in fact"—in terms of the defendants' revenue sharing practices. *Id.* at *1. That case is plainly distinguishable from this one, where plaintiffs' own pleading acknowledges and incorporates the specifics of the Plan's revenue sharing arrangement with the recordkeeper. In any event, *Kong II* was likely influenced by the sheer magnitude of the alleged loss—over *$30 million* in extra fees, *Mills*, 2022 WL 17825534, at *12 n.6—which is many multiples of the $2.13 to $3.39 million loss plaintiffs allege from defendants' share class choices here. *See* AC ¶ 98.

-12-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

key to stating a plausible excessive-fees claim is to make a like-for-like comparison."). Courts regularly reject plaintiffs' efforts to get around that fundamental pleading requirement with bare assertions that the services provided to different plans are materially the same and any variations "in the level and quality" of those services have "no material impact on fees." *Miller v. Packaging Corp. of Am.*, 2023 WL 2705818, at *5 (W.D. Mich. Mar. 30, 2023). *See, e.g., Tobias*, 2021 WL 4148706, at *14–15 (dismissing excessive recordkeeping fee claim because the plaintiffs "fail[ed] to provide any allegations regarding the specific services actually provided to the Plan by Fidelity" or "the fees paid by plans receiving the same or materially similar services," and instead "only provide[d] general statistics regarding the fees paid by plans of similar sizes.").[13]

Take, for example, plaintiffs' reliance on the NEPC Report to suggest—without grappling with the many specific services the Plan received from Fidelity—that $40 would have been a reasonable per-participant fee across the Plan as a whole. AC ¶ 50. As the NEPC Report itself explains, paying "fees above a median is *not indicative of imprudence*," and "any individual plan's fees should be assessed based on the services rendered and the plan's needs." Ex. N at 16. "Even the lowest-cost share class available may not result in an optimal arrangement for any given plan, *or even the lowest overall cost to a plan*; each plan's individual circumstances might counsel for a different arrangement." *Id.* For these reasons, courts have rejected attempts to infer

[13] *See also, e.g., Sigetich v. Kroger Co.*, 2023 WL 2431667, at *9 (S.D. Ohio Mar. 9, 2023) (allegations that "any minor variations in the level and quality of [recordkeeping and administrative] services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers" were "wholly conclusory"); *Probst v. Eli Lilly & Co.*, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) (allegations "that all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services" were "wholly conclusory" and did not plausibly show that fees were "excessive relative to the services rendered"); *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 (S.D.N.Y. 2023) ("The plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range."); *Guyes v. Nestle USA, Inc.*, 2022 WL 18106384, at *4 (E.D. Wis. Nov. 21, 2022) (allegation that plan "received a standard package of [recordkeeping] services" did not support inference that fees "were excessive relative to the recordkeeping services received" (alteration in original)); *Mator v. Wesco Distrib., Inc.*, 2022 WL 3566108, at *4–5, *7 (W.D. Pa. Aug. 18, 2022) (dismissing claims based on conclusory allegations that other recordkeepers "provided identical or similar services of the same quality").

-13-

imprudence merely because a plan's recordkeeping fees exceeded the so-called $40 "reasonable" fee cited in NEPC's surveys. *See, e.g.*, *Singh v. Deloitte LLP*, 123 F.4th 88, 96 (2d Cir. 2024) (rejecting allegation that plans surveyed in NEPC's report were "comparable" to the plan at issue or that the sample "otherwise provides a meaningful benchmark" to assess the reasonableness of a particular plan's recordkeeping fees).

In any case, plaintiffs allege the Plan *did* pay $40 per participant in 2022, and paid roughly that amount in 2016 and 2023 (AC ¶ 59)—allegations that should foreclose plaintiffs' theory as to those years. In addition, the NEPC Report, which was based on a survey of 240 defined contribution plans, found that fewer than half of plans with between 5,000 and 10,000 participants paid less than $40 in recordkeeping fees annually and around a quarter of plans paid *more* than $50 annually. Ex. N at 14. While the Plan here falls on the low end of that cohort— with between 6,214 and 7,652 participants during the relevant period—plaintiffs still allege that Plan participants paid annual fees roughly around those benchmarks. AC ¶ 59.

It follows that the NEPC Report in no way supports an inference that "the same services were available for less on the market." *See Wehner*, 2021 WL 507599, at *6 (dismissing prudence claim alleging excessive recordkeeping fees because plaintiff's allegations did not "make clear why [plaintiff's] market comparator . . . provides an accurate comparison to the fees charged by the [p]lan at issue in this case"); *Young*, 325 F. App'x at 33 (requiring plaintiff to plead facts showing that compensation was "so disproportionately large that it b[ore] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining"). And with nothing more than conclusory allegations, plaintiffs' theory that Fidelity received excessive compensation as a result of the Plan's investment in revenue-sharing classes of mutual funds—the flip side of their complaint about share classes—must fail as a matter of law.

### 2. Plaintiffs' Alternative Fund Theory Likewise Does Not Permit an Inference of Imprudence

Plaintiffs' other theory in support of Count I is that defendants breached their fiduciary duties by offering five allegedly "imprudent" Plan investment options: the T. Rowe Price Equity

-14-

Index 500, MFS Growth R4, JPMorgan US Small Company L, Janus Henderson Triton I, and PGIM Quant Solutions Small-Cap Val Z. AC ¶¶ 173–227. This theory, too, fails to raise a plausible inference of fiduciary breach.

As explained, ERISA's prudence standard is based on *process*, not results—leaving courts to evaluate whether the fiduciaries "employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Donovan*, 716 F.2d at 1232. Where, as here, plaintiffs proceed via inference rather than through process allegations, "it is not enough for a plaintiff simply to allege that the fiduciaries could have obtained better results—whether higher returns, lower risks, or reduced costs—by choosing different investments." *Anderson*, 137 F.4th at 1021. Rather, the "key to nudging an inference of imprudence from possible to plausible is providing a sound basis for comparison—a meaningful benchmark—not just alleging that costs are too high, or returns are too low." *Id.* The Amended Complaint does not clear this hurdle for multiple reasons.

*First*, plaintiffs' identification of five allegedly superior alternative funds says absolutely nothing about the reasonableness of the five challenged funds. *See* AC ¶¶ 183, 190, 199, 207, 216. "[S]imply labeling funds as comparable or as in the same category . . . is insufficient to establish that those funds are meaningful benchmarks." *Phillips v. Cobham Advanced Elec. Sols., Inc.*, 2025 WL 2689268, at *5 (N.D. Cal. Sept. 19, 2025) (alteration in original). That is particularly true where, plaintiffs, like here, are comparing *passively*-managed, low-cost index funds to *actively*-managed Plan funds. *See* AC ¶¶ 190–91, 199–200, 216–17.[14] As courts have repeatedly held, "passively-managed funds are *not comparable* to actively-managed funds in any meaningful way because the two types of funds have different aims, different risks, and different potential rewards that cater to different investors." *Wehner*, 2021 WL 507599, at *10; *see, e.g.*, *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *3 (N.D. Cal. Oct. 5, 2020) ("[A]llegations that passively managed funds are available as alternatives to the actively managed funds offered

---

[14] Plaintiffs also allege two index funds, the T. Rowe Price Equity Index 500 and Janus Henderson Triton I funds, should have been replaced by alternatives, but those alternatives likewise employ different and distinct investment strategies and pose different and distinct risks.

-15-

in the [p]lan do not suffice to demonstrate imprudence.").[15]  Thus, the mere "fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged fund was] an imprudent choice at the outset."  *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018).  The same is true of costs.  *See, e.g.*, *Wehner*, 2021 WL 507599, at *10 (rejecting "apples-to-oranges comparisons of an actively-managed fund's fees to a passively-managed index fund's fees due to the differences in the way the funds are managed"); *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11–12 (S.D.N.Y. Oct. 7, 2019) (index fund's fees "cannot be meaningfully compared" to actively-managed fund's fees); *see also Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *20 (S.D. Fla. Aug. 10, 2007) (recognizing variance in fees charged by "competing strategies").  Put another way, "[c]omparing apples and oranges is not a way to show that one is better or worse than the other."  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020); *see Phillips*, 2025 WL 2689268, at *9 ("The fact that some other funds charged lower fees does not support a plausible inference that the [challenged funds] charged *unreasonable* fees." (emphasis in original)).

Insofar as plaintiffs are alleging that the fiduciaries should have avoided higher-cost actively-managed investment options altogether, that claim also fails as a matter of law.  "[A] fiduciary's failure to offer the cheapest investment option is not enough by itself to state a claim for a breach of fiduciary duty."  *Patterson v. Cap. Grp. Cos.*, 2018 WL 748104, at *4–5 (C.D. Cal. Jan. 23, 2018); *see also Hecker*, 556 F.3d at 586 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)."); *Divane v. Nw. Univ.*, 953 F.3d 980, 989 (7th Cir. 2020) ("That plaintiffs prefer low-cost index funds . . . does not make [an active fund's] inclusion in the plans a fiduciary breach.").  As courts have repeatedly recognized, "fiduciaries have latitude to value investment features *other than price* (and indeed, are *required to do so*)."  *White I*, 2016 WL

---

[15] Although the Ninth Circuit eventually reversed the dismissal of a subsequently filed amended complaint against Salesforce on similar grounds, it agreed with the district court that the plaintiffs did not plausibly allege a breach of the duty of prudence merely because the plan included both passively-managed *and* actively-managed funds.  *Davis v. Salesforce.com, Inc.*, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022).

-16-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

4502808, at \*9.  Plaintiffs' argument fails in any event because the Plan already included low-cost index fund options for participants who wished to forego the risk-reward proposition (and higher costs) of active management.  *See, e.g.*, AC ¶¶ 96–98 (alleging Plan offered multiple index funds).  When a plan offers a "diverse mix of investment options and expense ratios for participants," the mere fact that other funds might offer even lower expenses ratios does not support an inference that the "fiduciaries' process for selecting the fund options was flawed." *White I*, 2016 WL 4502808, at \*11–12.

*Second*, plaintiffs' theory would fail even if the alleged fund comparators and indexes were valid benchmarks.  The Amended Complaint contains a significant amount of performance data—largely known (and knowable) only in hindsight—to attempt to cast the challenged funds' performance in a negative light.  "But hindsight is the wrong metric for evaluating fiduciary duty," *Tibble v. Edison Int'l*, 729 F.3d 1110, 1136 (9th Cir. 2013), *vacated on other grounds*, 575 U.S. 523 (2015), which "requires prudence, *not prescience*," *Matney*, 80 F.4th at 1146.  As the Fourth Circuit stated in affirming a defense verdict in an ERISA fiduciary breach case, "[m]aybe—in hindsight—[the fiduciary] was wrong that it could do better (or maybe it was right and hit the market at the wrong time).  Again, though, prudence looks for process, not results." *Reetz v. Aon Hewitt Inv. Consulting, Inc.*, 74 F.4th 171, 183 (4th Cir. 2023).

The same is true here.  To the extent plaintiffs are alleging any observable underperformance *required* replacing certain funds, such a claim finds no support in the law. ERISA affords fiduciaries wide latitude in real-time to make a "range of reasonable judgments . . . based on their experience and expertise." *Hughes*, 142 S. Ct. at 742.  Thus, the "common practice of retaining investments through periods of under-performance as part of a long-range investment strategy is *plainly permitted*." *White II*, 2017 WL 2352137, at \*20; *see Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at \*6 (N.D. Cal. Feb. 8, 2019) (dismissing claim that challenged funds should have been replaced, based on "relatively short" alleged underperformance of "three to five years").[16]  That makes perfect economic sense.  As federal

---

[16] *See also Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) ("Precipitously selling a well-constructed portfolio in response to disappointing short-term losses,

-17-

agencies have cautioned, past performance is not a reliable indicator (let alone a guarantee) of future results. *See* 29 C.F.R. § 2550.404a-5(d)(1)(ii)(A) (DOL regulation requiring plan fiduciaries to caution participants that "an investment's past performance is not necessarily an indication of how the investment will perform in the future."); 17 C.F.R. § 230.482(b)(3)(i) (SEC regulation requiring disclaimer that "past performance does not guarantee future results."). ERISA therefore does not require fiduciaries to "reflexively jettison investment options in favor of the prior year's top performers." *Patterson*, 2019 WL 4934834, at *11.

Moreover, any such hindsight-based critique here is undermined by the fact that the Plan fiduciaries *did* replace four of the five challenged funds during the relevant period, AC ¶¶ 184, 203, 210, 215—the very action plaintiffs allege a prudent fiduciary *would* have taken, *id.* ¶¶ 225, 240.

For all of these reasons, plaintiffs' Alternative Fund Theory fails to support an inference of imprudence.

### C. Plaintiffs' Derivative Monitoring Claim Fails As a Matter of Law

Plaintiffs' claim for failure to monitor is derivative of their breach of fiduciary duty claim, and thus fails alongside that underlying claim. *Marks*, 2020 WL 2504333, at *8 (citing *Dorman v. Charles Schwab Corp.*, 2018 WL 6803738, at *7 (N.D. Cal. Sept. 20, 2018) ("The duty to monitor claim is essentially derivative of the breach of fiduciary duty claim. Because the breach of fiduciary duty cause of action fails to state a claim, this cause of action does as well.")). While plaintiffs also assert a separate claim that defendants caused the Plan to engage in prohibited transactions, a failure to monitor cannot be predicated solely on such a claim. *See Sievert*, 780 F. Supp. 3d at 881 (monitoring claim "is only viable when there is an underlying claim for *breach of*

---

as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan."); *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) ("Nothing in the record suggests that it was not reasonable and prudent to select conservative funds with long-term growth potential and to stay with those mutual funds even during years of lower performance."); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 707 (W.D. Mo. 2019) ("Were the [fiduciaries] to adopt a strategy of removing funds based on short-term underperformance, [p]lan participants would be forced to sell their shares at a lower price and miss out on any subsequent improved performance.").

-18-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

*fiduciary duty*"); *see, e.g.*, *Dorman*, 2018 WL 6803738, at *7 (dismissing monitoring claim based on failure to plead plausible breach of fiduciary duty, without discussing prohibited transaction claim).  In any case, the Amended Complaint appears to premise the monitoring claim solely on an alleged fiduciary breach, without reference to the prohibited transaction claim at all.  AC ¶¶ 245–52.

The monitoring claim fails for the additional, independent reason that the Amended Complaint is devoid of allegations concerning the defendants' monitoring process, let alone allegations that any monitoring fiduciary "failed to review the performance of its appointees at reasonable intervals" to ensure compliance with the ERISA's fiduciary duties.  *White I*, 2016 WL 4502808, at *18; *see, e.g.*, *In re Calpine Corp.*, 2005 WL 1431506, at *6 (N.D. Cal. Mar. 31, 2005) (dismissing monitoring claim based exclusively on appointees' actions).

### D.   Counts I and II Should be Dismissed With Prejudice

"The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).  This is now the second time plaintiff Sabana, now joined by two co-plaintiffs, has failed to plead a cognizable claim of fiduciary breach.  While the Court dismissed the original complaint for lack of subject matter jurisdiction and thus did not address whether the complaint stated a plausible claim under Rule 12(b)(6), the fiduciary breach and derivative monitoring claims here are substantially identical to the claims that were originally pleaded more than two years ago, and they fail for the same reasons.  Further amendment of the claims would therefore be futile, even if plaintiffs' prohibited transaction claim proceeds past the dismissal stage.  *See, e.g.*, *Marshall v. Northrop Grumman Corp.*, 2018 WL 1406703, at *4 (C.D. Cal. Feb. 15, 2018) (dismissing breach of fiduciary duty claims against some of the defendants with prejudice, where plaintiffs failed over multiple opportunities to state the basis for holding those defendants liable as fiduciaries).

### V.   CONCLUSION

For the foregoing reasons, the Court should dismiss Counts I and II of the Amended Complaint with prejudice, and should dismiss plaintiff Fikse from the action.

-19-

Dated:  January 29, 2026

CATALINA VERGARA
O'MELVENY & MYERS LLP

By:    /s/ *Catalina Vergara*
          Catalina Vergara

Attorneys for Defendants
CORELOGIC, INC. and THE RETIREMENT
PLAN COMMITTEE OF CORELOGIC, INC.
401(K) SAVINGS PLAN

-20-

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT